IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SALAH ALI ABDULLAH AHMED AL SALAMI, *et al.*, | ) ) ) | |
| *Petitioners/Plaintiffs*, | ) | |
| | ) | |
| *v.* | ) | Civil Action No. 05-CV-2452 (PLF) |
| | ) | |
| | ) | |
| GEORGE W. BUSH, *et al.*, | ) | |
| *Respondents/Defendants*. | ) | |
| | ) | |

**MOTION FOR ORDER REQUIRING RESPONDENTS TO PROVIDE COUNSEL FOR PETITIONERS AND THE COURT WITH NOTICE 30 DAYS IN ADVANCE OF ANY INTENDED REMOVAL OF PETITIONERS FROM GUANTÁNAMO**

Pursuant to Rule 65 of the Federal Rules of Civil Procedure and the All Writs Act, 28 U.S.C. § 1651, Petitioners Salah Ali Abudllah Ahmed Al Salami and Abdullah Al Sali Al Asoriya seek an order requiring Respondents to provide Petitioners' counsel and the Court with advance notice of any intended removal of Mr. Al Salami or Mr. Al Asoriya from Guantánamo Bay Naval Base in Cuba.  On information and belief, Respondents have contemplated or are contemplating removal of Petitioners from Guantánamo to foreign territories for torture or indefinite imprisonment without due process of law.  Petitioners request advance notice of any removal of Petitioners from Guantánamo to enable their counsel to contest such removal and to prevent interference with the Court's jurisdiction in this matter.

**STATEMENT OF FACTS**

Petitioner Al Salami is a citizen of Yemen who is being held as an "enemy combatant" at the Guantánamo Bay Naval Base in Cuba.  As detailed in the habeas petition he filed on December 22, 2005, Mr. Al Salami denies being an "enemy combatant" and contends

that he is being detained in violation of the Constitution, treaties, and laws of the United States and in violation of international law.

Petitioner Al Asoriya is a citizen of Saudi Arabia who is being held as an "enemy combatant" at the Guantánamo Bay Naval Base in Cuba. As detailed in the amended habeas petition he filed on December 28, 2005, Mr. Al Asoriya denies being an "enemy combatant" and contends that he is being detained in violation of the Constitution, treaties, and laws of the United States and in violation of international law.

Petitioners have reason to fear they will be transferred to countries where they will be tortured and/or detained indefinitely without due process of law. Upon information and belief, Respondents have secretly removed detainees and others suspected of terrorist crimes to other countries for interrogation or detention without complying with extradition or other legal process. This practice, known as "rendition," "irregular rendition," or "extraordinary rendition," is understood to be used by Respondents to facilitate interrogation by subjecting detainees to torture and interrogation techniques that would be unlawful if used in the United States.

According to reports by American and foreign news organizations, including the *Washington Post,* the *Los Angeles Times* and the British Broadcasting Corporation, the United States Government has repeatedly transferred detainees into the custody of foreign governments that employ inhumane and illegal interrogation techniques. According to a recent article in the *New Yorker,* the "rendition" process was originally "a program aimed at a small, discrete set of suspects–people against whom there were outstanding foreign arrest warrants," but after September 11, 2001, came to include a "wide and ill-defined population that the Administration terms 'illegal enemy combatants.'" Jane Mayer, *Outsourcing Torture,* New Yorker, Feb. 14, 2005, http://www.newyorker.com/fact/content/?050214fa_fact6. According to the *Washington Post,*

> Since Sept. 11, the U.S. government has secretly transported dozens of
> people suspected of links to terrorists to countries other than the United
> States, bypassing extradition procedures and legal formalities, according
> to Western diplomats and intelligence sources.  The suspects have been
> taken to countries . . . whose intelligence services have close ties to the
> CIA and where they can be subjected to interrogation tactics–including
> torture and threats to families–that are illegal in the United States, the
> sources said.  In some cases, U.S. intelligence agents remain closely
> involved in the interrogation, the sources said.

Rajiv Chanrasekaran & Peter Finn, *U.S. Behind Secret Transfer of Terror Suspects,* Wash. Post,

Mar. 11, 2002, at A1; *see also* Dana Priest & Barton Gellman, *U.S. Decries Abuse But Defends*

*Interrogations,* Wash. Post, Dec. 26, 2002, at A1.  The countries to which detainees may be

brought are known to practice torture.  *See, e.g.,* Megan K. Stack & Bob Drogin, *Detainee Says*

*U.S. Handed Him Over For Torture,* L.A. Times, Jan. 13, 2005, at A1 ("News accounts,

congressional testimony and independent investigations suggest that [the CIA] has covertly

delivered at least 18 terrorism suspects since 1998 to Egypt, Syria, Jordan and other Middle

Eastern nations where, according to State Department reports, torture has been widely used on

prisoners.").

    According to recent news accounts, Guantánamo detainee Mamdouh Habib was

rendered to Egypt by the United States before being moved to Cuba.  During his six months in

Egyptian custody, Mr. Habib was allegedly tortured without mercy:

> He said that he was beaten frequently with blunt instruments, including an
> object that he likened to an electric "cattle prod."  And he was told that if
> he didn't confess to belonging to Al Qaeda he would be anally raped by
> specially trained dogs. . . .  Habib said that he was shackled and forced to
> stand in three torture chambers: one room was filled with water up to his
> chin, requiring him to stand on tiptoe for hours; another chamber, filled
> with water up to his knees, had a ceiling so low that he was forced into a
> prolonged, painful stoop; in the third, he stood in water up to his ankles,
> and within sight of an electric switch and a generator, which his jailers
> said would be used to electrocute him if he didn't confess.

Mayer, *Outsourcing Torture,* at [54.]  The credibility of Mr. Habib's account is bolstered by the

U.S. Department of State, which has consistently identified the Egyptian government as a

practitioner of torture.  In a report released on February 28, 2005, for example, the State

Department found that "there were numerous, credible reports that security forces tortured and

mistreated detainees" and that "torture and abuse of detainees by police, security personnel, and

prison guards remained common and persistent."  U.S. Dep't of State, *Country Reports on*

*Human Rights Practices, Egypt 2004,* http://www.state.gov/g/drl/rls/hrrpt/2004/41720.htm, at §

1(c).

  The U.S. State Department has also identified the governments of Yemen and Saudi

Arabia as practitioners of torture.  In a report released on March 8, 2006, for instance, the State

Department found that "acknowledged torture" was reported in Yemen and that "members of the

[Yemeni] Political Security Office (PSO) and Ministry of Interior (MOI) police forces tortured

and abused persons in detention."  U.S. Dep't of State, *Country Reports on Human Rights*

*Practices, Country Reports on Human Rights Practices, Yemen 2005,*

http://www.state.gov/g/drl/rls/hrrpt/2005/61703.htm, at § 1(c).  Regarding the government of

Saudi Arabia, in a report released on March 8, 2006, the State Department found that

> authorities abused both citizens and foreigners. Ministry of Interior (MOI)
> officials were responsible for most incidents of abuse of prisoners,
> including beatings, whippings, and sleep deprivation. In addition, there
> were allegations of beatings with sticks and suspension from bars by
> handcuffs. There were allegations that these practices were used to force
> confessions from prisoners.

U.S. Dep't of State, *Country Reports on Human Rights Practices, Saudi Arabia 2005,*

http://www.state.gov/g/drl/rls/hrrpt/2005/61698.htm, at § 1(c).

  Petitioners Al Salami and Al Asoriya also have reason to fear that they will be

transferred into the custody of the governments of Yemen and Saudi Arabia or a third country for

continued illegal detention without due process of law.  On information and belief, a number of

detainees have been removed to countries where they have been imprisoned and denied access to

courts.  Moreover, recent news reports indicate that the United States government has

contemplated transferring "large numbers of Afghan, Saudi and Yemeni detainees from the

military's Guantánamo Bay, Cuba, detention center into new U.S.-built prisons in their home

countries."  *See, e.g.,* Dana Priest, *Long-Term Plan Sought For Terror Suspects,* Wash. Post, Jan.

2, 2005, at A1.

## ARGUMENT

Under the All Writs Act, 28 U.S.C. § 1651(a), this Court has the inherent power "to

issue injunctions to protect its jurisdiction."  *SEC v. Vision Communications, Inc.,* 74 F.3d 287,

291 (D.C. Cir. 1996); *Envtl. Def. Fund v. EPA,* 485 F.2d 780, 784 n.2 (D.C. Cir. 1973).

Petitioners' request meets the fundamental purpose of preliminary injunctive relief: "to preserve

the status quo between the parties pending a final determination of the merits of the action."  13

*Moore's Federal Practice 3d* § 65.20 (2004).

Each of the four factors to be weighed in awarding preliminary injunctive relief

favors the requested injunction here:  (1) Petitioners will suffer irreparable harm if the injunction

is denied; (2) no harm will be suffered by Respondents if the injunction is granted; (3) Petitioners

are likely to succeed on the merits of their claims; and (4) there is a clear public interest in

preventing Respondents from rendering individuals to foreign countries for detention and torture.

*See Al-Fayed v. CIA,* 254 F.3d 300, 303 & n.2 (D.C. Cir. 2001); *Serono Labs., Inc. v. Shalala,*

158 F.3d 1313, 1317-18 (D.C. Cir. 1998); *Mova Pharm. Corp. v. Shalala,* 140 F.3d 1060, 1066

(D.C. Cir. 1998).

Petitioners stand to suffer immeasurable and irreparable harm–from torture to

possible death–at the hands of a foreign government.  Transfer to another country, even if "only"

for continued imprisonment, also potentially circumvents Petitioners' right to adjudicate the

legality of their detention in this Court.  By contrast, Respondents, who, on information and

belief, have already held Petitioners for several years, are asked only to provide the Court and

Petitioners' counsel with adequate notice of any intended removal of the Petitioners from Guantánamo.  It is difficult to imagine how Respondents would suffer any harm from complying with such a request.

Petitioners are likely to succeed on the merits of their claims.  Petitioners have properly invoked the jurisdiction of this Court.  *See Rasul v. Bush,* 124 S. Ct. 2686, 2698 (2004). Judge Green previously ruled that detainees in circumstances similar to those of Petitioners Al Salami and Al Asoriya have stated actionable claims under the Due Process Clause and the Geneva Conventions.  For the United States Government to remove Petitioners to countries that would afford no such protections would be at odds with Judge Green's ruling and enable Respondents to bypass the Court's jurisdiction. Such a transfer would also violate basic international legal norms embodied not only in the Geneva Conventions but also in the International Covenant on Civil and Political Rights and the Convention Against Torture and Other Cruel and Degrading Treatment and Punishment.

Finally, public policy favors requiring Respondents to provide advance notice to counsel and the Court of any intended removal of Petitioners from Guantánamo.  No matter how satisfied Respondents may be that their actions are lawful, the public good requires that a federal litigant–properly before the Court and represented by counsel–be given a meaningful opportunity to contest his transfer into the hands of those who might torture him or detain him indefinitely.

## CONCLUSION

For the reasons discussed above, the motion should be granted.

Dated:    May 13, 2006                    Respectfully submitted,


/s/ _____
David L. Engelhardt (DC429886)
Johnisha Matthews (DC492478)
John C. Snodgrass (DC473864)

Reginald B. McKnight (DC493946)
DICKSTEIN SHAPIRO LLP
2101 L Street NW
Washington, DC 20037
Tel: (202) 785-9700
Fax: (202) 887-0689

*Of Counsel*
Barbara J. Olshansky (NY0057)
Director Counsel
Tina Monshipour Foster (NY5556)
Gitanjali S. Gutierrez (NY1234)
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
Tel: (212) 614-6439
Fax: (212) 614-6499

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument and all

attachments has been served by electronic mail on the following counsel for Respondents:

Terry M. Henry, Esq.
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 6120
Washington, DC 20530

Andrew I. Warden
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 6120
Washington, DC 20530

on this 13th day of May 2006.

/s/
John C. Snodgrass