IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SALAH ALI ABDULLAH AHMED AL SALAMI, *et al.*,<br>    *Petitioners/Plaintiffs*,<br><br>v.<br><br>GEORGE W. BUSH, *et al.*,<br>    *Respondents/Defendants*. | Civil Action No. 05-CV-2452 (PLF) |

**EMERGENY MOTION FOR PRESERVATION ORDER AND POINTS AND
AUTHORITIES IN SUPPORT THEREOF**

Respondents allege that Petitioner Salah Ali Abdullah Al Salami (ISN #693) ("Al Salami") is deceased as a result of an apparent suicide, but to date, Respondents have failed to provide counsel with a death certificate, an autopsy report, or any other official documentation of Al Salami's death or the circumstances thereof. Counsel therefore persist in their habeas representation of Al Salami.[1] In addition, counsel has been authorized to represent the family of Al Salami. *See* Declaration of Robert H. Knowles, attached hereto as Exhibit A.

Al Salami and his father and Next Friend, Petitioner Ali Abdullah Al Salami (collectively, "Petitioners") now respectfully request an Order compelling Respondents to (1) produce to the Court official documentation of Al Salami's death; and (2) preserve and maintain

---

[1] This is not the first time counsel has had to question Respondents' unsupported allegations of Al Salami's status. Respondents initially maintained that they were "unable to confirm the identity of petitioner Saleh Ali Abdullah Al Salami as a detainee at Guantánamo Bay," and required counsel to produce evidence of Al Salami's detention. *See* Dec. 30, 2005 E-mail from Preeya M. Noronha, attached hereto as Exhibit B. In response, counsel produced a letter Al Salami had written to his father from Camp Delta in 2003, along with other identifying information. *See* Feb. 15, 2006 E-mail from Hanna Madbak, attached hereto as Exhibit C. Respondents ultimately admitted that Al Salami was in their custody. *See* Feb. 27, 2006 E-mail from Preeya M. Noronha, attached hereto as Exhibit D.

all evidence relating to his death, his detention, the reasons for his detention, any interrogations of him, his treatment and potential mistreatment, along with any and all other evidence sufficient to test the veracity of any official documentation of death produced by Respondents.

The need of an independent investigation into Al Salami's alleged suicide is apparent; the nature of such an investigation will be addressed separately.  What must be addressed now is the preservation of the evidence that will make an investigation possible.  This relief is required forthwith, to prevent the very persons and agencies who were responsible for Al Salami's detention, and who now claim that he died in their custody, from destroying or otherwise mishandling evidence that is necessary for a public determination of his status and their potential culpability.

Indeed, Respondents' announcement of Al Salami's alleged death is far from conclusive.  Respondents previously admitted that "there have already been two instances in which they incorrectly identified petitioners in the Guantánamo Bay detainee cases, errors which, unfortunately, were not discovered until counsel visited and interviewed these detainees at Guantánamo Bay."  *See* Respondents' Memorandum in Opposition to Petitioner's Motion for Entry of Protective Order at 3, n.3.  Respondents also admitted that "[g]iven the similar names or aliases of many of the approximately 500 individuals detained at Guantánamo Bay, it is often difficult, if not impossible, to correctly identify detainees based on the minimal information provided in the petitions."  *Id*. at 3 (emphasis added).  Indeed, at this point, based on the meager information made public by Respondents, it is not possible to know even *who* died in Respondents' custody, let alone *how*.

## BACKGROUND

Al Salami was a Yemeni citizen who, upon information and belief, was taken into custody as an enemy combatant in or before September 2004, and held incommunicado in

Guantánamo Bay, Cuba ever since.[2] Al Salami was never charged with any crime, was never able to examine any evidence against him, and, apparently, had no idea that he was represented by counsel. According to Respondents, on or about the morning of June 10, 2006, after spending at least 20 months under these conditions, Al Salami committed suicide by hanging himself in his cell.

From Al Salami's capture until his death, Respondents have had exclusive access to him, information concerning his apprehension and detention, treatment, state of mind, health, and now, his alleged death. It is crucial that a complete and accurate record of this evidence be preserved, so that, among other things, an independent investigation can proceed and Al Salami's family can learn the facts surrounding their son's fate and make determinations regarding future legal action. The evidence to be preserved includes but is not limited to: videos and logs of Al Salami (especially in the 24 hours before and after his death), photographs, suicide notes, medical and mental health records, interrogation records, Al Salami's ISN number, cell number, autopsy records, and any other documentary, photographic, video, or other records related to Al Salami or his detention or death in U.S. custody. Additionally, Petitioners seek the ISN numbers of the detainees in cells adjoining Al Salami's cell, so that they may be interviewed about the circumstances of Al Salami's alleged death.

I.      **THIS COURT HAS THE INHERENT POWER TO ENTER THE PRESERVATION ORDER**

This Court is empowered to enter a preservation order when circumstances warrant it. *Pueblo of Laguna v. United States*, 60 Fed. Cl. 133, 138 n.8 (2004); *see also United States v. Philip Morris USA, Inc.,* 327 F. Supp. 2d 21, 23 (D.D.C. 2004). The court in *Pueblo of Laguna*

---

[2] Familiarity with issues relating to the circumstances of Al Salami's detention is assumed, and is not to be repeated here. For a complete discussion of allegations regarding Al Salami's treatment during detention, *see* Al Salami's Petition for Writ of Habeas Corpus, dated Dec. 22, 2005.

3

set forth a two-part test to determine when a preservation order should be issued. It required that the party seeking "a preservation order demonstrate that it is [1] necessary and [2] not unduly burdensome." *Pueblo of Laguna*, 60 Fed. Cl. At 138.[3]

### A. A Preservation Order is Necessary

The Court's intervention is necessary to determine whether Al Salami is alive or dead. If dead, the circumstances of his death will never be known unless evidence is preserved.

Respondents' own actions following the alleged suicide raise reasonable doubts about their willingness and ability to manage and organize evidence: although Al Salami allegedly committed suicide in his own cell, it took Respondents more than two days to identify him. E-mail messages from the Department of Justice repeatedly indicated that the deceased Yemeni was named "Ali Abdullah Ahmed" and that he was unrepresented by counsel. *See* e-mail message from Terry Henry to Barbara Olshansky, dated June 10, 2006, attached hereto as Ex. E. It was not until the afternoon of Monday, June 12 that Respondents provided a name and ISN number for Al Salami, and acknowledged that he had counsel. *See* e-mail message from Terry Henry to Barbara Olshansky, dated June 12, 2006, attached hereto as Ex. F.

There is also legitimate concern that Respondents will intentionally dispose of relevant evidence. The FBI has documented efforts by the military to cover up the physical abuse of detainees. *See* Urgent Report, dated June 25, 2004, attached hereto as Ex. G. An FBI e-mail confirms that unnamed individuals "observed numerous physical abuse incidents

---

[3] Petitioners need not meet the requirements for a preliminary injunction. "[A] document preservation order is no more an injunction than an order requiring a party to identify witnesses or to produce documents in discovery." *Pueblo of Laguna*, 60 Fed. Cl. at 138 n.8. Although such pretrial and discovery orders take the basic form of an injunction (an order to do or not do something), courts need not observe the rigors of the four-factor analysis ordinarily employed in issuing injunctions. *Jarallah Al-Marri v. Bush,* Civ. No. 04-2035; s*ee also Casey v. Planned Parenthood*, 14 F.3d 848, 854 (3d Cir. 1994) (distinguishing such pretrial orders from injunctions).

4

. . .includ[ing] strangulation, beatings, placement of lit cigarettes into the detainees['] ear openings, and unauthorized interrogations." *Id*. at 2.[4] Specific "cover-up efforts" were identified in the e-mail, but redacted before it was produced in litigation brought by the ACLU. *Id.* The *New York Times* has reported that the military's own investigation into detainee abuse was prejudiced because "crucial witnesses were not interviewed, documents disappeared, and at least a few pieces of evidence were mishandled." Tim Golden, "Army Faltered in Investigating Detainee Abuse," *The New York Times*, May 22, 2005, at A1, attached hereto as Ex. H.

The preservation of an accurate record of the facts of Al Salami's detention and alleged death will bear heavily upon the rights and remedies of his Next Friend and other family members. Al Salami's father disputes the government's account of his son's death, asserting that Al Salami's devotion to Islam would have precluded suicide.[5] Former detainees who were released from detention—in an implicit admission of the unjustified nature of their detention—also have questioned the circumstances of Al Salami's death. Moazzam Begg, a British national who was recently released from Guantánamo, has stated that the camp is "designed to dehumanize detainees and to make them bereft of hope and believe they have no rights," and, furthermore, that the camp's regime "encourage[s] suicide amongst [the prisoners] – and suggest[s] imaginative ways to do so."[6]

The immediate preservation of evidence is critical to answering these

---

[4] In addition, *The New York Times* reported that two prisoners in military custody had been murdered by their U.S. military jailers. *Id.* This comes on top of numerous reports of torture, prisoner kidnapping (rendition), and ingenious physical and psychological abuse of prisoners in military custody in connection with the war on terror. Tim Golden, "Army Faltered in Investigating Detainee Abuse," *The New York Times*, May 22, 2005, at A1, attached hereto as Ex. H.

[5] *See* "Family Disputes Guantánamo Suicide," *available at* http://english.aljazeera.net/NR/exeres/A8853B89-9575-4F0B-AC11-E43BADAC52D3.htm, attached hereto as Ex. I.

[6] *See* "Released Detainees Refute US Guantanamo Suicide Cover Up," *available at* http://www.cageprisoners.com/articles.php?id=14508, attached hereto as Ex. J.

disturbing questions. The answer, in turn, will bear upon the legal rights of Al Salami's survivors—if indeed he is dead—and may affect the future treatment of other detainees, at least some of whom are certain to be released, as so many others have been released, precisely because they never belonged in captivity at all. In these circumstances, a preservation order is necessary.

### B.  A Preservation Order Would Not Be Unduly Burdensome

The only other requirement for issuing a preservation order is easily met. As the District Court has found in a similar proceeding, "entering a preservation order [against Respondents] will inflict no harm or prejudice upon them." *Jarallah Al-Marri v. Bush,* Civ. No. 04-2035 (GK). The failure to preserve evidence, however, would prejudice the Petitioners and their family, not to mention a democratic people's understanding of their own government's behavior. Finally, no security issues are gravely implicated here; the evidence, once preserved, will be subject to the Protective Order.

### CONCLUSION

For the foregoing reasons, the Court should compel the preservation of evidence by entering the proposed order attached hereto.

Dated: June 19, 2006

Respectfully submitted,

<u>/s/ David L. Engelhardt</u>
Frank C. Razzano (DC360173)
David L. Engelhardt (DC429886)
Johnisha Matthews (DC492478)
Reginald B. McKnight (DC493946)
John C. Snodgrass (DC473864)
Lisa Kaas (DC492302)
Jesse Levine
DICKSTEIN SHAPIRO MORIN
 & OSHINSKY LLP
2101 L Street N.W.
Washington, D.C. 20037
Tel: (202) 785-9700
Fax: (202) 887-0689

*Of Counsel*
Barbara J. Olshansky (NY0057)
Director Counsel
Tina Monshipour Foster (NY5556)
Gitanjali S. Gutierrez (NY1234)
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
Tel: (212) 614-6439
Fax: (212) 614-6499

7