*PREVIOUSLY FILED WITH THE COURT SECURITY OFFICER AND CLEARED FOR PUBLIC FILING ON AUG. 1, 2008*

David L. Engelhardt (DC429886)
John C. Snodgrass (DC473864)
Lisa M. Kaas (DC492302)
Erin C. Wilcox (DC982059)
DICKSTEIN SHAPIRO LLP
1825 Eye Street, NW
Washington, DC  20006-5403
Tel. (202) 420-2200
Fax (202) 420-2201

*Counsel for Petitioner Salah Ali Abdullah Ahmed Al Salami, ISN 693*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE: <br><br> PETITIONERS SEEKING HABEAS CORPUS RELIEF IN RELATION TO PRIOR DETENTIONS AT GUANTANAMO BAY | ) <br> ) <br> ) Misc. No. 08-0444 (TFH) <br> ) <br> ) Civil Action No. 05-2452 (PLF) <br> ) <br> ) <br> ) |

### RESPONSE TO ORDER TO SHOW CAUSE

Counsel for petitioner Salah Ali Abdullah Ahmed Al Salami (ISN 693) hereby submit this response to the Court's Order[1] of July 2, 2008 to show cause why this action should not be dismissed as moot. Counsel for petitioner respectfully submit that, despite the death of petitioner, issues remain that this Court can and should resolve.

### INTRODUCTION

The Court should decline to dismiss this petition as moot for two reasons. First, the circumstances of the instant petition present what appears to be a novel issue that this Court should address in the interests of justice. Respondents have not "produced the body" sufficiently to moot this habeas proceeding. Respondents retain important parts of petitioner's body

---

[1] Order, *Al Salami, et al. v. Bush, et al.*, No. 1:05-cv-02452-PLF, Doc. # 54 (July 2, 2008).

collected during the U.S. military's autopsy thereof.  Nor is this petition of the type that typically becomes moot upon death of the petitioner, such as when petitioner is a former prisoner seeking to overturn a wrongful conviction that negatively impacts his life after release, or when petitioner suffers an *explainable* death while challenging his unlawful detention.  Here, Petitioner died, in suspicious and unverifiable circumstances, after being held for years without charge in the custody that was being challenged, and respondents, who claim to have completed their investigation into petitioner's death – an alleged suicide that they characterized as an act of "asymmetric warfare"[2] – have refused to release any information about that investigation and indeed still retain, and refuse to share, key evidence.  That evidence includes certain organs and tissues of petitioner – *i.e.*, part of his body or "*corpus*" – essential to a medicolegal determination of the cause and manner of death.  This Court can and should, at a minimum, order the remainder of petitioner's body released.  Counsel is aware of no authority requiring dismissal of a habeas petition in the unique circumstances presented here.

Second, courts have recognized an exception to the mootness doctrine in cases where there exist issues of substantial public importance or great public interest.  There can be no doubt that the real story behind the first deaths of detainees (three died that day) in U.S. military custody at Guantánamo Bay is of tremendous concern to the American public, to the families of the men who died, and indeed, to the entire international community.  If the instant petition is dismissed as moot, the Court may effectively foreclose access to the truth about what happened.[3]

---

[2] *See* Sgt. Sara Wood, *Three Guantánamo Bay Detainees Die of Apparent Suicide*, Am. Forces Press Serv. (June 10, 2006), *available at* http://www.defenselink.mil/news/newsarticle.aspx?id=16080 (last visited July 24, 2008) (quoting Navy Rear Adm. Harry B. Harris); *see also* U.S. Department of Defense News Transcript, June 20, 2006: Radio Interview with Deputy Assistant Secretary Stimson on the Washington Post Radio, 1500 AM, 107.7 FM, Washington D.C., at 2.

[3] On June 14, 2007, counsel for petitioner filed a Freedom of Information Act ("FOIA") request with the Department of Defense seeking information concerning the detention and death of Al

## BACKGROUND

Petitioner Salah Ali Abdullah Ahmed Al Salami, a Yemeni national, died while in U.S. custody at Guantánamo Bay on or around June 10, 2006, purportedly by suicide. During petitioner's imprisonment at Guantánamo, counsel and petitioner's family received no information about petitioner's status or the reasons for his detention. The government never filed a factual return. No Combatant Status Review Tribunal ("CSRT") records that can be linked to petitioner have been produced, and an undated one and one-half page Summary of Administrative Review Board[4] Proceedings for an unnamed detainee listed only as "ISN 693" cannot be definitively identified with petitioner (it reflects that the detainee in question was not even in attendance), describes no charges against the detainee, and provides no information about the reasons for his detention.[5] Counsel never got a chance to meet with petitioner. He died at the very time counsel was making arrangements to visit the base, less than a month after

---

Salami. To date, no documents or information have been produced in response to that FOIA request, despite the government's representation that the investigation into petitioner's death has officially closed. (*See* Stipulated Mot. For Extension of Time, *Dickstein Shapiro LLP v. Department of Defense, et al.*, No. 1:08-cv-226-PLF, ¶ 2 (D.D.C. June 12, 2008).) Earlier this year, counsel filed a FOIA action in this Court, *Dickstein Shapiro LLP v. Department of Defense, et al.*, No. 1:08-cv-226-PLF (D.D.C. filed Feb. 11, 2008), which was designated as a related case to the instant habeas proceeding. The Court has ordered defendants to file a dispositive motion on or before August 15, 2008. (Minute Order, *Dickstein Shapiro LLP v. Department of Defense, et al.*, No. 1:08-cv-226-PLF (D.D.C. June 13, 2008). Counsel for petitioner expects defendants in the FOIA action to resist producing the requested records.

[4] The Administrative Review Board or "ARB" "process" purportedly is designed "to assess annually the need to continue to detain each enemy combatant," and at which the detainee may "explain why he is no longer a threat to the United States and its allies." Order, Administrative Review Procedures for Enemy Combatants in the Control of the Department of Defense at Guantanamo Bay Naval Base, Cuba (May 11, 2004), *available at* http://www.defenselink.mil/news/May2004/d20040518gtmoreview.pdf (last visited July 24, 2008).

[5] *See* attached Ex. 1.

3

DOJ informed counsel they were cleared to do so,[6] and without knowing that his father (and next friend on this petition) had prepared a videotaped message asking him to cooperate with his American attorneys.

After the death of petitioner and the two other detainees who died that day, respondents made statements to the press dismissing the deaths as "clearly planned by the detainees as a way to advance their cause in the war on terror . . . not an act of desperation,"[7] and calling petitioner a "mid- to high-level al Qaeda operative with links to principal al Qaeda facilitators and senior membership."[8] Of course, these unsupported claims cannot be officially confirmed because no ARB or CRST records or evidence summaries readily linked to petitioner contain any information about the reasons for his detention.

Respondents have claimed that petitioner was found hanging in his cell. Following an autopsy by a U.S. military pathologist, the shell of petitioner's body (less a number of organs and tissues) was returned to Yemen five days later and identified by next of kin. Petitioner's father vehemently disputes that his son would have committed suicide, which is viewed as sacrilege in Islam.[9]

---

[6] Email from Andrew Warden, U.S. Dept. of Justice, to John Snodgrass, Dickstein Shapiro LLP (May 16, 2006) (stating that "you have satisfied the requirements for privileged access to petitioner Al Salami") (attached hereto as Ex. 2).

[7] Sgt. Sara Wood, *Three Guantánamo Bay Detainees Die of Apparent Suicide*, Am. Forces Press Serv. (June 10, 2006), *available at* http://www.defenselink.mil/news/newsarticle.aspx? id=16080 (last visited July 24, 2008) (citing Navy Rear Adm. Harry B. Harris).

[8] Sgt. Sara Wood, *DoD Identifies Guantanamo Detainee Suicides*, Am. Forces Press Serv. (June 12, 2006), *available at* http://www.defenselink.mil/news/newsarticle.aspx?id=16072 (last visited July 24, 2008).

[9] *See Family Disputes Guantanamo Suicide*, Aljazeera.net (June 14, 2006), attached as Ex. I to Emergency Mot. For Preservation Order, *Al Salami, et al. v. Bush, et al.*, No. 1:05-cv-02452-PLF, Doc. # 17 (June 19, 2006) (quoting petitioner's father: "This idea of suicide is a lie. My son wouldn't commit suicide. My son was among those who memorised the Quran and was

Respondents never have released the results of the autopsies or the investigation into the death of petitioner on that June day more than two years ago.[10] A second, independent autopsy of petitioner's body was performed in Yemen by a team of pathologists led by the chief of the Institute of Legal Medicine of Lausanne University; however, because certain key organs and tissues – including specifically *the larynx, hyoid bone, and thyroid cartilage*, some or all of which uniquely can permit a pathologist to distinguish between hanging and manual strangulation (*i.e.*, homicide) – were not returned with the body, the results of this second autopsy were inconclusive.[11] The international human rights organization that coordinated this second autopsy attempted to obtain answers to the questions raised by the second autopsy from respondents' military pathologist,[12] but received no reply.[13] On information and belief,

---

committed to his religion. . . . He was assassinated by American soldiers and I call on the Yemeni and American governments for an international investigation.").

[10] Shortly after learning of petitioner's death, counsel for petitioner moved the Court for an emergency order to preserve evidence relating to petitioner's detention and death. Emergency Mot. for Preservation Order, *Al Salami, et al. v. Bush, et al.*, No. 1:05-cv-02452-PLF, Doc. # 17 (June 19, 2006). The Court never ruled on that motion.

[11] Nor were and the nail clippings from petitioner's fingers and toes returned, which could contain trace evidence showing that he had scratched an attacker in self defense, for example. *See* Letter from Rachid Mesli, Legal Director, Alkarama for Human Rights, to Dr. Craig T. Mallak, Armed Forces Medical Examiner (June 29, 2006) (attached hereto as Ex. 3). On information and belief, the same critical samples were retained by U.S. authorities in the cases of the two other detainees who died on June 10, 2006.

[12] In a letter to Armed Forces Medical Examiner Dr. Craig T. Mallak of June 29, 2006, the Legal Director of Geneva-based Alkarama For Human Rights sought to establish communication between Dr. Mallak and the team of pathologists who conducted the second autopsy of petitioner's body in Yemen, stating that the team "needs some documents, materials and explanations from your side in order for them to finalize their report of autopsy" and requesting, among other things, the rest of petitioner's organs and tissues and the report of the investigation at Guantánamo, including the circumstances of discovery of petitioner's body, the exact nature of the ligatures purportedly used, whether and what reanimation measures were taken, photographs, and records pertaining to petitioner's emotional state. Not surprisingly, no response was received.

respondents remain in possession of the numerous parts of petitioner's body[14] that were missing upon its return to Yemen, and they therefore hold the key that would unlock the truth about the circumstances of petitioner's death.

## DISCUSSION

### I. The Standard For Dismissal On Grounds Of Mootness

The doctrine of mootness derives from Article III, § 2, of the Constitution, which requires the existence of a "case or controversy" for federal jurisdiction to lie. *E.g.*, *Spencer v. Kemna*, 523 U.S. 1, 7 (1998); *Liner v. Jafco, Inc.*, 375 U.S. 301, 306 n.3 (1964). In addition to Article III, discretionary components of the doctrine have developed, based upon concerns of remedial utility and judicial administration. But, even within the federal courts' Article III decisions, there is flexibility in the application of the mootness doctrine. *See* 13A Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d § 3533.1. In fact, most decisions focus on the court's "ability to provide any presently meaningful remedy." *Id.* At the core of the various components of the mootness doctrine "is a search for the possibility that granting a present determination of the issues offered, and perhaps the entry of more specific orders, will have some effect in the real world." *Id.*

Mootness issues that arise in cases such as this, where events or changed circumstances overtake the pace of adjudication, typically compel a "highly individualistic, and usually intuitive, appraisal of the facts of each case." *Id.* § 3533. In addition to revolving around

---

[13] Adam Beaumont, *Doubt Cast Over Guantanamo "Suicides,"* swissinfo (Mar. 2, 2007), available at http://www.swissinfo.org/eng/swissinfo.html?siteSect=43&sid=7581369 (last visited July 24, 2008) (attached hereto as Ex. 4).

[14] The report of the second autopsy of petitioner's body (original and English translation attached hereto as Exs. 5 and 6, respectively) lists as missing or not identifiable the following organs: larynx and pharynx, thyroid cartilage, hyoid bone, upper section of the trachea, part of the neck musculature, cervical ganglions, esophagus, renal lodges, mesentery, suprarenals, pancreas, gall bladder, prostate, testicles, appendix, and pituitary gland.

specific facts, the mootness inquiry may be "shaped by the desire to decide, or to avoid deciding, difficult issues or matters that seem affected with a public interest," thus defying any attempt to force the analytic steps into neatly carved boxes. *Id.* The central theme of cases in which mootness was rejected because something remained that the court could accomplish – regardless of the specific facts and rationale – is that "decision should not be denied if a *worthwhile remedy* can be given." *Id.* § 3533.3 (emphasis added). Thus, the Court's assessment here should turn on the general policy of granting *effective relief* whenever the Court can do so.

### A. Mootness In The Context Of Habeas Corpus

Although the Great Writ of habeas corpus historically was an instrument to secure production of "the body" of the petitioner before a tribunal to test the legality of detention, *see, e.g.*, *Carafas v. LaVallee,* 391 U.S. 234, 238 (1968), the federal habeas statute contemplates the existence of some "other remedy" besides the petitioner's presentation or release. The statute broadly describes the relief that may be granted, requiring the courts to "summarily hear and determine the facts, and dispose of the matter *as law and justice require*." 28 U.S.C. § 2243 (emphasis added); *Carafas*, 391 U.S. at 239 (noting that the 1966 amendments to the statute contemplate the potential of relief other than release from custody); *Sanders/Miller v. Logan*, 710 F.2d 645, 656 (10th Cir. 1983) (holding habeas suit not mooted by parole, and remanding for vacation of conviction and "any further relief which law and justice require on further consideration of the cause by the district court").

This flexibility is exemplified by a decision of the D.C. Circuit, in a habeas proceeding brought by a petitioner who, following his conviction and confinement for robbery, was transferred from Lorton prison to the D.C. jail, while his appeal from a rejected petition was pending in the Fourth Circuit. Petitioner alleged that the government transferred him to thwart his appeal). The D.C. Circuit held that the appeal was not mooted by this illegal transfer and

7

continued, "whatever grounds there may have been for the transfer . . . [i]t is not too much to require that [respondent/appellee corrections officials] justify their course." *Bolden v. Clemmer*, 298 F.2d 306, 309 (D.C. Cir. 1961) (noting that the district courts have the "power in a habeas corpus proceeding to dispose of the matter as the law may require"). Suspicious of the reasons behind the transfer, the Court in that case was willing to entertain relief other than the traditional presentation or release of petitioner, implying that petitioner should promptly be returned to Lorton. *Id.*

Several years later, in *Carafas v. LaVallee*, the Supreme Court made clear that a habeas petition is not rendered moot by the petitioner's release from custody. 391 U.S. at 238 (holding that the "in custody" requirement of 28 U.S.C. § 2254 is determined at the time the petition is filed). Where a habeas petitioner who was in custody at the time of filing his petition is no longer in custody, and seeks to show that subsequent release has not rendered his petition moot, he must demonstrate that he continues to present a "case or controversy" for the court to decide. *E.g.*, *Qassim v. Bush*, 466 F.3d 1073, 1078 (D.C. Cir. 2006), *citing Zalawadia v. Ashcroft*, 371 F.3d 292, 297 (5th Cir. 2004); *Kemplen v. Maryland*, 428 F.2d 169, 171 (4th Cir. 1970) (holding habeas petition not moot where petitioner was released from custody but stigmatized; "the result that we reach today will apparently mean something to the petitioner and will be more than a mere exercise in judicial futility"). While a number of courts have had occasion to consider the survival of habeas petitions following the death of the petitioner, typically finding such cases to be moot,[15] none appear to have considered a death in the unique circumstances presented here.

---

[15] *See, e.g.*, *Brooks v. Estelle*, 702 F.2d 84 (5th Cir. 1983) (petition moot after death sentence carried out); *Hann v. Hawk*, 205 F.2d 839 (8th Cir. 1953) (petitioner died before decision on appeal by warden; appeal concerning legality of petitioner's release from state prison in habeas

**II.      This Case Is Not Moot Because Respondents Still Retain A Portion Of Petitioner's Body**

As explained in more detail *supra*, counsel for petitioner have reason to believe that respondents remain in possession of multiple organs from petitioner's body, including among other things his larynx and pharynx, thyroid cartilage, hyoid bone, upper trachea, and part of his neck musculature.[16] *See* Exs. 3, 6. Combined with other evidence apparently withheld by respondents, these organs and tissues are needed to determine how petitioner died.

Because this Court has the power to order the production of petitioner's body via this habeas action, and because significant parts of petitioner's body have yet to be produced, the Court can grant effective relief by requiring respondents, at a minimum, to produce forthwith all organs, tissues, or other anatomical samples taken from petitioner's body. The Court also could, in the interests of justice, require the production of all evidence and reports relating to respondents' investigation of petitioner's death while in their custody. Because the Court can provide a remedy that comports with the principles of habeas corpus relief, would finally end the "continuing effects" of petitioner's detention (*i.e.*, by the full and complete repatriation of

---

proceeding was moot); *Parkman v. Harrison*, No. 01-7028, 2002 WL 1461799, at *1 (D.C. Cir. 2002) (no discussion of mootness finding; citing *Hann v. Hawk*); *In re Kravitz*, 504 F. Supp. 43 (M.D. Pa. 1980) (petitioner died while petition pending; neither social stigma of murder conviction nor inability to inherit from victim avoided mootness); *United States ex rel. Schwartz v. Lennox*, 320 F. Supp. 754 (E.D. Pa. 1971) (petitioner died before argument on petition; case was moot where there was no showing that retirement benefits would have been more in absence of conviction; moreover, writ not intended to be used by beneficiaries).

[16] Should respondents dispute this fact, the burden is on them to prove otherwise. Assuming a dispute over facts, the party claiming mootness bears the burdens of production and persuasion in demonstrating that mootness has in fact occurred. *See, e.g.*, *Firefighters Local 1784 v. Stotts*, 467 U.S. 561, 569 (1984); *In re Sokolowski*, 205 F.3d 532, 534 (2d Cir. 2000) (debtor claimed automobile creditor's appeal of injunction against repossession was moot because car was no longer in her possession; mootness rejected because debtor "failed to proffer competent evidence to support her claim * * *").

petitioner's body to Yemen), and would serve the interests of justice, the Court should decline to find this habeas petition moot.

Indeed, a number of courts have held that an action seeking injunctive relief is not mooted by the *partial* completion of an act, the full completion of which could very well moot the case. For example, in *West v. Secretary of Department of Transportation*, the Ninth Circuit considered the mootness of a case seeking to enjoin construction of a highway and to declare that an environmental impact statement was required. Despite the completion of part of the project, the court ruled that worthwhile remedies remained available – for example, the court could address the remainder of the project via injunctive relief. 206 F.3d 920, 924-26 & n.4, 929-30 (9th Cir. 2000) (*quoting* Wright & Miller, 13A Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d § 3533.3: "The central question of all mootness problems is whether changes in the circumstances that prevailed at the beginning of litigation have forestalled any occasion for meaningful relief. . . . [C]ourts must be careful to appraise the full range of remedial opportunities."); *see also San Diego Chapter of Surfrider Found. v. Dalton*, 196 F.3d 1057, 1058 n.1 (9th Cir. 1999) (action for injunction not moot where first phase of project complete but second not yet begun). Similarly, the Fifth Circuit declined to dismiss a case as moot that challenged a public housing project under the National Environmental Policy and Historic Preservation Acts, where the redevelopment project was partially complete, but where substantial work that could be addressed by an injunction remained to be done. *Coliseum Square Ass'n v. Jackson*, 465 F.3d 215, 227-28 (5th Cir. 2006), *cert. denied*, 128 S. Ct. 40 (Mem.) (2007). *See also Rockford Drop Forge Co. v. Donovan*, 672 F.2d 626, 629 (7th Cir. 1982) (action to quash inspection warrant not moot where warrant was partially executed, because further inspection was desired).

Even more closely analogous to the issue here is a decision of the Second Circuit in a case where the plaintiff prisoner had been transferred to another facility, but something of his was retained by the transferring facility. *Thompson v. Carter*, 284 F.3d 411 (2d Cir. 2002). The prisoner, Thompson, brought an action seeking, *inter alia*, an order that one of the corrections officers at the original prison return medication that had been seized from him. The defendants claimed that the case was moot because Thompson had requested only injunctive relief and because he was no longer confined at the original prison where the defendants were employed. But the court held that the action was not moot, stating that, "[i]n this case, a live controversy continues between Thompson and Carter: Thompson's request for an order directing Carter to return Thompson's medications." *Id.* at 415. This was not, the court said, "the more usual [scenario] in which the inmate plaintiff seeks prospective relief . . . against employees at one facility that would be useless after his transfer to a second facility." *Id.* Rather, Thompson retained a legally cognizable interest in the injunctive relief sought.

And finally, the D.C. Circuit found a continuing controversy that avoided mootness in a case where the FBI would retain possession of certain evidence demanded by plaintiffs. In *Utz v. Cullinane*, 520 F.2d 467 (D.C. Cir. 1975), several plaintiffs who had been arrested for and charged with various crimes brought an action for injunctive and declaratory relief to enjoin the D.C. Chief of Police and the director of the police department's records division from transmitting plaintiffs' arrest records (including fingerprint cards) to the FBI, and seeking the return of the records already sent. One of the arguments asserted on appeal by defendant-appellees was that the case was moot, because the plaintiff-appellants' criminal cases had been disposed of and they therefore could not be prejudiced by pre-conviction dissemination of arrest records. But the Court found that substantial rights of the appellants remained to be vindicated,

because the FBI would retain the records already in their possession unless relief was granted, explaining:

> Appellants' constitutional and statutory claims are essentially grounded in the contention that routine dissemination whether preconviction or post-exoneration is improper and results in a *legally cognizable harm; in the absence of an adjudication by this court, the arrest record of appellant Bolling will remain with the FBI*, and those of appellants Utz and Boyd will be transmitted to the FBI, while an adjudication in their favor will eventuate in an order to retrieve those already sent and to refrain from sending those still in the sole possession of the Metropolitan Police. *Clearly, we are presented with a continuing live legal controversy affecting . . . substantial rights.*

*Id.* at 472-73 n.9 (emphasis added).  *See also FTC v. Ernstthal*, 607 F.2d 488, 489 (D.C. Cir. 1979) (in appeal from enforcement of subpoenas in FTC proceeding, where FTC retained possession of subpoenaed documents and did not intend to return them if consent decree was reached, Judge Bazelon held that the case was not mooted by the impending disposition of the proceeding, stating "[t]here thus remains a live controversy between the parties").

Common to all of these cases is that the challenged conduct resulted in continuing harm, and the courts still could act to remedy that harm by limiting it prospectively, just as is the situation before the Court on this petition.  In these circumstances, the parties retain a legally cognizable interest in the outcome of the matter, despite perhaps some piece of it being "said and done."  Counsel for petitioner recognize the novelty of the position that respondent's *partial* production of petitioner's body following his death in custody is not sufficient to avoid mootness, but the case law cited above supports this position.  Moreover, the unique circumstances of this case – the suspicious death of petitioner, the lack of any meaningful information or evidence from respondents, and the secretive and highly controversial nature of Guantánamo in general – warrant injunctive relief in the interests of justice.

12

**III.     Substantial Public Interest Militates In Favor Of The Court Deciding This Case**

In addition to the continuing interests at stake in this petition described above that should avoid mootness, courts have recognized an exception to mootness in cases where issues of significant public importance are involved.  "[I]t is settled doctrine that courts go further both to give and withhold relief in the light of consideration of public interest." *Alton & So. Ry. v. Int'l Ass'n of Machinists*, 463 F.2d 872, 880 (D.C. Cir. 1972), *citing Virginian Ry. Co. v. Sys. Federation No. 40*, 300 U.S. 515, 552 (1937).  For example, the Ninth Circuit has extolled the "public interest in having the issue now before the court resolved with some hope of finality" in a case that the court said "affects the most sensitive of human relationships" (there, the relation between a father and his children; here, the interest of petitioner's father in laying his son – all of him – to rest) and "also directly involves the vital jurisdictional harmony of two sovereign entities" (there, the State of Montana and the Blackfeet Tribe; here, potentially the U.S. and Yemen).  *U.S. ex rel. Cobell v. Cobell*, 503 F.2d 790, 794 (9th Cir. 1974) (appeal of issuance of writ in habeas proceeding brought by father to secure release of children from grandmother's custody was not moot where there had been voluntary cessation of the challenged conduct).  And the Supreme Court of California ruled, in a habeas proceeding, that "issues of grave public concern" would be decided.  *In re M.*, 473 P.2d 737, 741 (Cal. 1970) (holding, despite that petitioner was released from detention and effectively was granted the habeas relief sought, that juvenile courts may not automatically order pre-hearing detention).  The court doubted that it would have another opportunity to resolve the important issues raised and therefore declined to declare the case moot on its unusual facts.  *Id.* at 743.

Although the recognized "desirability of judicial determinations of important questions," standing alone, will not avoid dismissal of an otherwise moot case, *e.g.*, *Alton & So. Ry.*, 463 F.2d at 880, here, petitioner's habeas case is not moot for the reasons discussed in the

13

section above.  And while some decisions require a showing of the potential for recurrence of the challenged conduct, the D.C. Circuit has observed that, the greater the level of public interest, the lesser the need for the possibility of recurrence to justify decision.  *Id.*; *cf. Richardson v. Ramirez*, 418 U.S. 24, 35-36 (1974) (noting the strong practical argument that conduct "*incapable* of repetition" should be redressed in the public interest because evading review (citation omitted, emphasis added)).

The fact that the people of this nation and the world have been and remain intensely interested in the ongoing imprisonment without charge of hundreds of individuals at Guantánamo Bay, combined with the Supreme Court's recent decision in *Boumediene* and its repercussions in this Court, undeniably show that the Court is confronting issues of international notoriety.  Moreover, given the significant media attention accorded the first deaths at Guantánamo in 2006, of which petitioner was one; the subsequent lack of information from the government concerning the investigation (and indeed the government's brazen efforts in this action to review and indefinitely preclude disclosure of *all evidence* concerning the deceased detainees, including everything in their cells, even privileged attorney-client communications)[17]; and the release of the independent autopsy findings concerning petitioner and public call for answers from the U.S. government,[18] there can be no doubt that this *particular action* is of substantial public importance.

---

[17] *See* Resp'ts' Mot. For Procedures Related to Review of Certain Detainee Materials and Request For Expedited Briefing, *Al Salami, et al. v. Bush, et al.*, No. 1:05-cv-02452-PLF, Doc. # 21 (July 7, 2006).

[18] *See, e.g.*, Letter from Santiago A. Canton, Executive Director, Inter-American Commission on Human Rights, Organization of American States, to Michael Ratner and Maria Lahood, Center for Constitutional Rights (June 12, 2006) (attached hereto as Ex. 7) (describing request that the government provide information about the alleged suicides within 10 days), Adam Beaumont, *Doubt Cast Over Guantanamo "Suicides,"* swissinfo (Mar. 2, 2007), available at

Were the Court to grant injunctive relief in this action requiring respondents to produce the remainder of petitioner's body and release the evidence and records associated with the investigation of his death, it is entirely possible that the evidence could demonstrate that petitioner died of homicide, not suicide, and could even implicate his killer or killers.  The very real potential of a government cover-up of this magnitude with regard to Guantánamo strongly counsels that the Court decide this case in the interests of justice, transparency, and public understanding.

## CONCLUSION

For cause shown above, counsel for petitioner respectfully submit that the Court should decline to find the instant habeas petition to have been mooted by the untimely death of petitioner in respondents' custody.  Petitioner's body has not been fully returned and thus cannot be fully laid to rest.  Moreover, it would be a fundamental miscarriage of justice to permit the evidence concerning petitioner's death to be buried with the same callous disregard that respondents exhibited toward petitioner's rights during the last years of his life.

Dated: July 25, 2008                                             Respectfully submitted,

                                                                 DICKSTEIN SHAPIRO LLP


                                                                     /s/ Lisa M. Kaas
                                                                 David L. Engelhardt (DC429886)
                                                                 John C. Snodgrass (DC473864)
                                                                 Lisa M. Kaas (DC492302)
                                                                 Erin C. Wilcox (DC982059)
                                                                 DICKSTEIN SHAPIRO LLP
                                                                 1825 Eye Street, NW
                                                                 Washington, DC  20006-5403
                                                                 Tel. (202) 420-2200
                                                                 Fax (202) 420-2201

---

http://www.swissinfo.org/eng/swissinfo.html?siteSect=43&sid=7581369 (last visited July 25, 2008) (attached hereto as Ex. 4).

*Counsel for Petitioner Salah Ali Abdullah Ahmed Al Salami, ISN 693*

16

DSMDB-2475905v02

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of July, 2008, a true and correct copy of the foregoing *Response To Order To Show Cause* was filed by hand-delivery with the Court Security Officer for clearance for public filing, who served copies upon the following:

**James J. Schwartz**
U.S. DEPARTMENT OF JUSTICE
20 Massachusetts Avenue, NW
Washington, DC 20001

**Judry Laeb Subar**
U.S. DEPARTMENT OF JUSTICE
P.O. Box 833
Suite 7342
Washington, DC 20044-0833

**Terry Marcus Henry**
U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION
P.O. Box 883
20 Massachusetts Avenue, NW
Suite 7144
Washington, DC 20044

**Andrew I. Warden**
U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION
FEDERAL PROGRAMS BRANCH
20 Massachusetts Avenue, NW
Washington, DC 20530

                                                /s/ John C. Snodgrass
                                              John C. Snodgrass

DSMDB-2475905v02