

Directeur: Professeur Patrice Mangin
Rue du Bugnon 21, CH - 1005 Lausanne
Tél: 41 21 314 70 70 - Fax: 41 21 314 70 90
E-mail: IUML.Central@hospvd.ch

Maître Rachid Mesli
Alkarama for Human Rights
2 bis Chemin des Vignes
1209  Genève

Lausanne, le 20 juillet 2006

*N/réf. M0600113*
*PM/BH/BS/dc*

**Concerne :    ALI ABDULLAH Ahmed, né le 09.03.1969 – 2ème autopsie médico-légale**

Maître,

Par lettre du 19 juin 2006, vous nous avez mandatés, sur demande de la famille, afin de procéder à une seconde autopsie médico-légale du corps d'une personne dont l'identité nous a été communiquée comme étant celle de ALI ABDULLLAH Ahmed, âgé de 37 ans.

Nous avons répondu à votre demande. Nous vous prions de trouver ci-joint notre rapport qui se base sur :

a)    l'autopsie médico-légale (2ème autopsie) effectuée par l'équipe de l'Institut universitaire de médecine légale de Lausanne - Suisse

b)    les examens histologiques

c)    les analyses toxicologiques

d)    les analyses de génétique forensique

e)    l'examen d'odontostomatologie médico-légal

f)    les renseignements communiqués par l'Organisation « Alkarama For Human Rights »

Etat de Vaud - Hospices cantonaux - CHUV
Département universitaire de Médecine et de Santé communautaires
Université de Lausanne - Faculté de Médecine

# Procès-verbal de la 2<sup>ème</sup> autopsie médico-légale

Procès-verbal de l'autopsie médico-légale du corps dont l'identité nous a été communiquée comme étant celle de

**ALI ABDULLAH Ahmed**, né le 09.03.1969 et dont le décès aurait été constaté le 10.06.2006, au camp de détention de Guantanamo Bay,

pratiquée le 21 juin 2006, dès 16h30, à la morgue de l'Hôpital militaire de Sanaa (Yémen), par le Professeur P. MANGIN, Directeur de l'Institut universitaire de médecine légale de Lausanne, le Dr B. HORISBERGER, la Dresse B. SCHRAG, avec l'aide de Monsieur Guido TESTORI, préparateur, et en présence du Procureur adjoint de Sanaa, et des Drs ALKAHIN Fouad, ALHARANI Muktar et ALARIGI Abdul-Rab.

---

## A. Examen externe

1. Cadavre d'un homme qui serait âgé de 37 ans, de constitution robuste, présentant un bon état de nutrition et mesurant 164 cm. Il s'agit d'un homme de corpulence moyenne. Le cadavre nous est présenté nu, enveloppé dans un drap blanc en coton et une housse noire en plastique fermant par une fermeture-éclair. Le cadavre apparaît bien conservé, sans signes de putréfaction. Il a été apparemment conservé au froid par congélation. Le jour prévu pour l'autopsie, le cadavre était encore froid, partiellement congelé, si bien que les opérations ont dû être différées de cinq heures, temps nécessaire pour que l'autopsie devienne praticable.

2. La rigidité cadavérique est abolie au niveau des quatre membres ainsi qu'au niveau des articulations temporo-mandibulaires.

3. Les téguments sont hâlés, de trophicité et d'hydratation normales. Il n'existe pas de pigmentation particulière. Sur les parties déclives correspondant à un décubitus dorsal, on note des lividités cadavériques de couleur rouge foncé, persistant à la pression d'un doigt. Ces lividités sont également légèrement visibles à la face antérieure des deux jambes. Les parties sur lesquelles le corps repose sont épargnées.

4. Le cadavre présente des traces d'intervention postmortem sous forme d'incisions linéaires, suturées et compatibles avec une autopsie médico-légale de première intention. Il s'agit notamment de :

   - à la face antérieure du tronc, une grande incision en forme de « Y » dont la branche verticale mesure 41 cm et s'étend le long de la ligne médiane de la

région sus-pubienne jusqu'à une ligne horizontale passant à 3 cm au dessus de la ligne bi-mamelonnaire ; à ce niveau, cette incision se poursuit par les deux branches obliques du « Y » de manière symétrique en direction du relief antérieur des deux épaules pour se poursuivre ensuite le long du bord antéro-externe du membre supérieur droit sur une longueur de 60 cm où elle s'interrompt en regard de la face dorsale du poignet et le long du bord antéro-externe du membre supérieur gauche sur une longueur de 60 cm pour se terminer à la face dorsale du poignet correspondant,

- à noter, au niveau de la branche verticale médiane abdominale, que l'incision comporte une autre branche perpendiculaire à la précédente, à 6,5 cm au dessus de l'ombilic, dirigée sur 4 cm vers la droite,

- au niveau du membre supérieur droit, présence d'une autre incision postmortem s'étendant le long du bord postéro-interne, débutant de la région postérieure de l'épaule correspondante jusqu'à la face antérieure du poignet droit, sur une longueur de 70 cm,

- au niveau du membre supérieur gauche, la même incision postmortem que la précédente se retrouve le long du bord postéro-interne, sur une longueur de 70 cm et s'étendant de la région postérieure de l'épaule correspondante jusqu'à la face antérieure du poignet gauche,

- au niveau du tiers inférieur de l'avant-bras droit, présence de sept incisions postmortem suturées, linéaires, verticales, parallèles, réparties sur l'ensemble de la circonférence et mesurant jusqu'à 7,5 cm de long,

- au niveau du tiers inférieur de l'avant-bras gauche, le même type d'incision postmortem est retrouvé au nombre de six et mesurant jusqu'à 8 cm de long,

- au niveau des membres inférieurs, présence à gauche d'une grande incision postmortem verticale, linéaire, s'étendant de la région inguinale, le long de la face antérieure de la cuisse, du genou, de la jambe et s'arrêtant à hauteur de la cheville après une distance de 80 cm,

- au niveau du membre inférieur droit, même type d'incision que la précédente s'étendant de la région inguinale jusqu'à la cheville, le long de la face antérieure de la cuisse, du genou et de la jambe, sur une hauteur de 85 cm,

- à la face postérieure du tronc et des membres inférieurs, présence de deux grandes incisions postmortem verticales, linéaires, parallèles, para-médianes gauche et droite, s'étendant symétriquement des régions scapulaires postérieures droite et gauche jusqu'aux régions fessières homolatérales, puis le long des faces postérieures des cuisses, des régions poplitées, des faces postérieures des deux jambes pour s'interrompre des deux côtés au dessus

des talons ; l'incision para-médiane droite mesure 141 cm ; l'incision para-médiane gauche mesure 139 cm,

- au niveau du membre inférieur droit, en regard du tiers inférieur de la jambe, présence de sept incisions postmortem verticales, linéaires, suturées, parallèles, réparties sur l'ensemble de la circonférence du membre et mesurant jusqu'à 16 cm de long,

- au niveau du membre inférieur gauche, en regard du tiers inférieur de la jambe, présence de six incisions postmortem verticales, linéaires, suturées, parallèles, s'échelonnant sur l'ensemble de la circonférence et mesurant jusqu'à 13 cm de long,

- au niveau de l'extrémité céphalique, présence d'une incision postmortem en forme de « fer à cheval » s'étendant d'une région mastoïdienne à l'autre en passant à hauteur des jonctions pariéto-occipitales et mesurant 36 cm de long; à noter également une autre incision postmortem suturée s'étendant dans la région sous-occipitale droite, le long de la base du crâne sur une longueur de 5 cm et siégeant au sein d'une plaque parcheminée mesurant 5,5 x 3 cm,

- au niveau de la moitié inférieure de la partie postérieure du cou, présence d'une incision postmortem verticale, le long de la ligne médiane, s'étendant jusqu'à la région thoracique supérieure sur une longueur de 21 cm ; cette incision se termine de façon légèrement curviligne vers la droite à sa partie inférieure.

5.  La tête est de forme ovale avec une mobilité anormale de la calotte crânienne en rapport avec une autopsie déjà effectuée ainsi qu'attestent les multiples incisions postmortem déjà décrites. Les cheveux sont de couleur noire, d'une longueur moyenne de 3 cm. Pour rappel, le cuir chevelu est l'objet d'une incision en « fer à cheval » allant d'une mastoïde à l'autre. En dessous et en arrière de cette incision, le cuir chevelu a été rasé sur une hauteur de 3 cm ainsi qu'au niveau de la région occipitale médiane basse sur une surface de 10 x 4 cm. On note par ailleurs la présence de deux plaques parcheminées, de constitution postmortem, mesurant pour l'une 1,5 x 1 cm et l'autre 5 x 2 cm. Ces deux plaques parcheminées siègent dans la région occipitale médiane pour la plus grande et dans la région rétro-mastoïdienne gauche pour la plus petite. Au niveau de la région rétro-mastoïdienne droite, il existe trois autres plaques parcheminées mesurant respectivement 0,7 cm de diamètre, 1 x 0,7 cm et 1 x 1,7 cm. Pour rappel, présence d'une incision postmortem le long de la base du crâne dans la région sous-occipitale droite mesurant 5 cm et siégeant au sein d'une plaque parcheminée mesurant 5,5 x 3 cm.

6.  Les téguments de la face sont pâles, sans signes de congestion visibles. On note la présence d'une barbe avec des poils noirs mesurant de 2 à 3 cm de long.

7. Le squelette facial est intact.

8. Les yeux sont fermés. Les globes oculaires sont affaissés. Les conjonctives sont le siège d'une hyperémie, sans pétéchies caractéristiques visibles. Les sclérotiques sont sans particularité Les cornées sont troubles. Les pupilles ne sont plus visibles. L'iris est de couleur difficilement appréciable. Présence d'une zone parcheminée de 0,5 cm de diamètre en dessous de l'angle externe de l'œil gauche, en regard du rebord orbitaire externe.

9. Le squelette nasal est intact. Les orifices narinaires sont obstrués par deux tampons d'ouate imbibés par un liquide rouge brunâtre.

10. Les lèvres sont l'objet d'une déshydratation avec un dessèchement plus marqué au niveau de la lèvre inférieure. Au niveau de l'arcade dentaire inférieure, on note l'absence de la première incisive médiane gauche (N° 31). En regard, la gencive est l'objet d'une plaie contuse à bords irréguliers de 0,7 cm de haut et 0,3 cm de large. Cette plaie est entourée d'une zone de suffusion hémorragique s'étendant sur une largeur de 2,5 cm au niveau du sillon gingivo-labial (exarticulation de la dent N° 31). Le reste de la dentition présente un état satisfaisant. A noter la présence d'un liquide brunâtre au fond de l'orifice buccal.

11. Les pavillons auriculaires sont sans particularité Les conduits auditifs externes sont libres.

12. Le cou est le siège d'un sillon de couleur rouge brunâtre, incomplet au niveau de la région occipitale médiane. Ce sillon est orienté obliquement de bas en haut et d'avant en arrière. Dans sa partie antérieure, il se situe en regard du tiers moyen de la face antérieure du cou. Au niveau postérieur, le point de suspension virtuel se situe dans la région occipitale médiane. Ce sillon est bien visible dans les régions latérales du cou où il est parcheminé et s'estompe en arrière à la verticale de l'insertion postérieure de l'oreille droite et à gauche à la verticale du massif mastoïdien correspondant où il semble se prolonger par quelques plaques parcheminées de 0,5 cm de diamètre. Dans son trajet latéro-cervical droit et gauche, ce sillon est bien délimité et mesure 1 cm de hauteur. En revanche, dans sa partie antérieure, il est moins bien délimité sur quelques centimètres et moins visible à la face antérieure du cou où il s'étend sur une hauteur de 2 cm au maximum. Le cou ne présente aucune mobilité anormale, en particulier pas d'effet de piston.

13. La cage thoracique est normalement bombée. La palpation du gril costal révèle des fausses mobilités en rapport avec les manœuvres d'autopsie antérieure.

14. L'abdomen est plat. Au niveau de la fosse iliaque droite, présence d'une plaque parcheminée filiforme, horizontale, de 0,5 x 0,1 cm.

15. La région pubienne a été rasée. Les organes génitaux externes sont normalement développés. Présence d'une circoncision ancienne. Les testicules ne sont pas palpables au niveau des bourses.

16. Les téguments du dos sont sans particularité A noter une fine cicatrice verticale, légèrement oblique, au niveau de la ligne axillaire postérieure droite, mesurant 3 x 0,2 cm, située à 17 cm en dessous du creux axillaire pour sa partie supérieure.

17. Le membre supérieur droit est en position normale. On note la présence d'une zone de dermabrasion de 0,8 x 0,4 cm sur le versant interne de l'articulation du coude. Cette dermabrasion est de couleur rouge foncé et légèrement parcheminée. Au niveau du pli du coude droit, au sein d'une grande ecchymose rouge violacé, de 8 cm de haut sur 4,5 cm de large, il existe une plaie punctiforme de 0,2 cm de diamètre. Au niveau de la face dorsale de la main droite, dans sa partie supéro-interne, il existe une ecchymose mal délimitée, de couleur rouge foncé, mesurant 6 cm de haut sur 3 cm de large. A noter qu'à la loupe binoculaire, le centre de cette ecchymose présente une petite plaie orificielle de moins de 1 mm de diamètre. Au niveau de la main droite, les extrémités des ongles ont été découpées. Les bords des ongles sont ainsi irréguliers, en partie amputés, avec de petites excoriations du lit de chaque ongle en regard. La région palmaire est le siège d'une pigmentation noirâtre (prélèvement des empreintes digitales).

18. Le membre supérieur gauche est en position normale. On note la présence d'une dermabrasion linéaire, filiforme, légèrement oblique, mesurant 4 cm de long sur 0,2 cm de large. Autre dermabrasion filiforme, parallèle à la précédente, à 2 cm au dessus, mesurant 0,3 cm de long. Les bords des ongles de la main gauche ont été également découpés. Les bords sont irréguliers, en partie amputés, avec aussi des petites excoriations du lit de chacun des ongles en regard. Au niveau des deux mains, on note une cyanose unguéale prononcée. La région palmaire est le siège d'une pigmentation noirâtre (prélèvement des empreintes digitales).

19. Les membres inférieurs sont en position normale. Au niveau de la hanche gauche, sur sa face externe, il existe plusieurs zones de parcheminement rouge brunâtre, sur une surface de 6 cm de haut et 5 cm de large, mesurant chacune jusqu'à 1 cm de long sur 0,2 cm de large. Sur la face antéro-externe de la moitié supérieure de la cuisse gauche, présence d'une zone de discoloration intéressant une surface de 7 cm de haut sur 4 cm de large et marquée par des circonvolutions violacées mesurant jusqu'à 1 cm de long. La face plantaire des deux pieds est également l'objet d'une pigmentation noirâtre (prélèvement des empreintes plantaires). A noter que les extrémités des ongles des orteils ont également été découpées tant à droite qu'à gauche.

# B. Incisions des téguments et des plans sous-jacents

## 20. Nuque

L'ouverture de la nuque est pratiquée à travers l'incision déjà présente sur la ligne médiane.

*Etat actuel :*

- altération cadavérique modérée de la musculature

*Interventions complémentaires :*

- prolongation de l'incision sur la ligne médiane de 2 à 3 cm dans la région basse occipitale
- incisions longitudinales de la musculature
- palpation des processus épineux de la colonne cervicale et de la partie supérieure de la colonne thoracique

*Constatations :*

- pas d'ecchymose, ni hématome
- pas de fausse mobilité des processus épineux lors de la palpation

## 21. Parties distales des membres

L'ouverture des parties distales des membres est pratiquée à travers les incisions déjà présentes.

## 22. *Tiers distal de l'avant-bras droit*

*Etat actuel :*

- 7 incisions longitudinales intéressant la peau et le tissu sous-cutané, ouvrant partiellement les fascia musculaires

*Constatations :*

- pas d'ecchymose ni hématome dans les plans cutané, sous-cutané et musculaire

23. *Tiers distal de l'avant-bras gauche*

*Etat actuel :*

- 6 incisions longitudinales intéressant la peau et le tissu sous-cutané, ouvrant partiellement les fascia musculaires

*Constatations :*

- pas d'ecchymose ni hématome dans les plans cutané, sous-cutané et musculaire

24. *Tiers distal de la jambe droite*

*Etat actuel :*

- 7 incisions longitudinales intéressant la peau et le tissu sous-cutané, ouvrant partiellement les fascia musculaires

*Constatations :*

- pas d'ecchymose ni hématome dans les plans cutané, sous-cutané et musculaire

25. *Tiers distal de la jambe gauche*

*Etat actuel :*

- 6 incisions longitudinales intéressant la peau et le tissu sous-cutané, ouvrant partiellement les fascia musculaires

*Constatations :*

- pas d'ecchymose ni hématome dans les plans cutané, sous-cutané et musculaire

26. *Pli du coude droit*

*Etat actuel :*

- plaie punctiforme fraîche entourée d'une ecchymose

*Interventions complémentaires :*

- incision intéressant la peau et le tissu sous-cutané
- prélèvement : peau avoisinant la plaie punctiforme

*Constatations :*

- suffusion hémorragique dans le tissu sous-cutané

27. **Dos de la main droite**

*Etat actuel :*

- plaie punctiforme entourée d'une ecchymose

*Interventions complémentaires :*

- incision intéressant la peau et le tissu sous-cutané
- prélèvement : peau avoisinant la plaie punctiforme

*Constatations :*

- suffusion hémorragique dans le tissu sous-cutané

## C. Ouverture des cavités et examen du cou

28. **Cavité crânienne**

L'ouverture du crâne est pratiquée à travers l'incision déjà présente.

*Etat actuel :*

- pour rappel : incision du cuir chevelu mesurant environ 36 cm de long en «fer à cheval» à concavité ouverte vers l'arrière, s'étendant d'un processus mastoïdien à l'autre
- ouverture de la calotte crânienne suivant la base du crâne
- la calotte crânienne est fixée au moyen d'un fil de suture avec plusieurs « va et vient » d'un muscle temporal à l'autre
- la dure-mère a été détachée et enlevée
- la cavité crânienne a été totalement éviscérée
- ouverture partielle de la partie médiane de la base de l'étage antérieur au niveau du corps sphénoïdal et de l'éthmoïde

*Interventions complémentaires :*

- incisions des muscles temporaux
- incisions de la galéa aponévrotique

*Constatations :*

- cuir chevelu : rougeâtre, d'épaisseur moyenne
- cuir chevelu et muscles temporaux : pas d'ecchymose ni hématome
- dure mère : absente
- calotte crânienne : 14,8 x 17,5 cm de diamètre, entre 0,3 et 0,9 cm d'épaisseur, pas de fausse mobilité, pas de transparence pathologique
- base du crâne : configuration normale aux trois étages, sans particularité en dehors de l'ouverture de la partie médiane de la base de l'étage antérieur (voir ci-dessus)
- l'hypophyse est inappréciable

## 29. Cavité thoraco- abdominale

L'ouverture de la cavité thoraco- abdominale est pratiquée à travers l'incision déjà présente sur la ligne médiane.

*Etat actuel :*

- section du plastron
- présence d'un sac en plastique orange contenant des viscères
- cavité thoraco-abdominale : vide par éviscération totale une fois le sac en plastique enlevé avec présence de quelques millilitres de liquide rouge brunâtre (sang?) dans les gouttières latéro-vertébrales thoraciques et lombaires

*Interventions complémentaires :*

- ouverture de la colonne vertébrale
- dégagement des côtes et des clavicules
- incisions des muscles psoas
- prélèvements : muscles psoas

*Constatations :*

- pannicule adipeux thoracique et abdominal : peu épais
- musculature des parois thoraco-abdominales : pas d'ecchymose ni hématome
- gril costal : élasticité correspond à l'âge, pas de fracture
- colonne vertébrale : pas de fracture des corps vertébraux
- disques intervertébraux : pas d'hémorragie (absence de signes de Simon)

- bassin : pas de fracture

## 30. **Cou**

L'ouverture du cou est pratiquée par deux incisions sur les faces latérales.

*Etat actuel :*

- éviscération du cou

*Interventions complémentaires :*

- incision à la face latérale droite, s'étendant de l'épaule droite à la région mastoïdienne droite
- incision à la face latérale gauche, s'étendant de l'épaule gauche à la région mastoïdienne gauche
- incisions du platysma jusqu'au niveau de l'arcade dentaire inférieure
- incisions dans la musculature pré- et paravertébrale
- ouverture des artères carotides
- prélèvements : fragment de la peau au niveau du sillon, fragment de tissu fibro-adipeux à gauche, fragment du muscle sterno-cleïdo-mastoïdien droit

*Constatations :*

- circonférence du cou : 39,5 cm
- tissu fibro-adipeux : en regard du sillon déjà décrit, dans la région latéro-cervicale gauche, juste en dessous et légèrement en arrière de l'angle mandibulaire, présence d'une suffusion hémorragique mesurant 2,5 cm de large, 2 cm de haut et 0,3 cm de profondeur
- musculature : en regard du même sillon parcheminé, dans la région latéro-cervicale droite, au niveau de la moitié supérieure du muscle sterno-cleïdo-mastoïdien et dans sa partie antérieure, présence d'une suffusion hémorragique mesurant 3 cm de large, 6,5 cm de haut et 1,5 cm de profondeur
- musculature pré- et paravertébrale : pas d'ecchymose ni d'hématome
- musculature et tissu fibro-adipeux en regard du bord supérieur de la partie médiane de la mandibule et de l'arcade dentaire inférieure : pas d'ecchymose ni hématome
- artères carotides : discrets signes d'artériosclerose, davantage au niveau des bifurcations carotidiennes
- colonne vertébrale : sans particularité à la palpation

## D. Examen des viscères

31. Dans le sac en plastique orange mentionné ci-dessus, les viscères suivants ont été retrouvés.

32. **Cerveau**

*Etat actuel :*

- découpé en tranches

*Interventions complémentaires :*

- prélèvements : cortex, cervelet

*Constatations :*

- cortex, cervelet : en partie identifiable
- consistance : friable à pâteuse
- couleur : gris à rosé
- pas de tumeur solide, pas de hémorragie, pas de corps étranger

33. **Organes du cou**

34. *Langue*

*Etat actuel :*

- séparée des viscères du cou
- siège d'une section transversale

*Constatations :*

- relief : normal
- pas d'ecchymose ni d'hématome

35. *Thyroïde*

*Etat actuel :*

- fragments de parenchyme thyroïdien

*Interventions complémentaires :*

- prélèvement : fragment de parenchyme

*Constatations :*

- parenchyme : sombre, homogène, sans hémorragie

36. ***Trachée***

*Etat actuel :*

- présence uniquement du tiers inférieur avec bifurcation identifiable
- ouverte dans la partie membraneuse

*Constatations :*

- pas d'ecchymose, ni d'hématome, ni de corps étranger
- muqueuse : rouge brunâtre, autolysée

37. **Organes du thorax**

38. ***Péricarde***

*Etat actuel :*

- en partie présent
- rouge foncé

*Constatations :*

- pas de lésions

39. ***Cœur***

*Etat actuel :*

- à l'état de fragments
- partiellement disséqué, pointe séparée

*Interventions complémentaires :*

- ouverture du départ des artères coronaires
- prélèvements : fragments des parois des ventricules

*Constatations :*

- myocarde : élastique, brun rouge, pas de foyer de fibrose ni d'infarctus
- épaisseur du myocarde : 0,3 cm au niveau du ventricule droit, 1,4 cm au niveau du ventricule gauche

- système valvulaire : limité à la valve aortique
- valve aortique : 6 cm de circonférence, souple
- artères coronaires : identifiables qu'à l'origine avec quelques rares plaques d'artériosclérose

40. *Poumon (bilobé)*

*Etat actuel :*
- altération cadavérique modérée
- incisions au niveau des régions para- et péri-hilaires

*Interventions complémentaires :*
- ouverture des artères pulmonaires
- ouverture des bronches
- incisions plus fines de l'ensemble du parenchyme
- prélèvement : fragment du parenchyme pulmonaire

*Constatations :*
- pas de pétéchies sous-pleurales
- plèvre : lisse, brillante
- parenchyme : homogène, violacé, succulent
- artères pulmonaires : lumière libre, paroi souple
- bronches : lumière libre, muqueuse rouge foncée

41. *Poumon (trilobé)*

*Etat actuel :*
- altération cadavérique modérée
- incisions au niveau des régions para- et péri-hilaires

*Interventions complémentaires :*
- ouverture des artères pulmonaires
- ouverture des bronches
- incisions plus fines de l'ensemble du parenchyme
- prélèvement : fragment du parenchyme pulmonaire

*Constatations :*
- pas de pétéchies sous-pleurales
- plèvre : lisse, brillante
- parenchyme : homogène, violacé, succulent
- artères pulmonaires : lumière libre, paroi souple
- bronches : lumière libre, muqueuse rouge foncée

42. **Organes abdominaux**

43. ***Diaphragme***

*Etat actuel :*
- séparé des viscères
- en partie présent sous forme d'un grand fragment détaché

*Constatations :*
- homogène, violacé
- sans particularité

44. ***Rate***

*Etat actuel :*
- organe en entier
- découpé en tranches transversales

*Interventions complémentaires :*
- prélèvement : fragment du parenchyme

*Constatations :*
- taille : 5 x 8 x 2,5 cm
- capsule : mince
- surface : lisse
- parenchyme : homogène, rouge foncé, diffluente
- structure : pas reconnaissable

## 45. *Foie*

*Etat actuel :*

- sous forme de quelques fragments
- entièrement découpés en tranches

*Interventions complémentaires :*

- prélèvements : fragments du parenchyme

*Constatations :*

- capsule : mince
- surface : lisse
- parenchyme : brun rougeâtre, structure habituelle, consistance élastique, friabilité normale
- pas de signes de fibrose ou de stéatose

## 46. *Reins*

*Etat actuel :*

- deux reins présents
- entièrement découpés en tranches
- bassinets : ouverts

*Interventions complémentaires :*

- prélèvements : parenchyme

*Constatations :*

- surfaces : lisses
- parenchymes : flasques, structure habituelle
- bassinets : souples

## 47. *Aorte*

*Etat actuel :*

- fragment d'aorte abdominale jusqu'au niveau de la bifurcation iliaque
- ouverte longitudinale
- absence des artères rénales

*Interventions complémentaires :*
- mesure de la circonférence

*Constatations :*
- circonférence au dessus du tronc coeliaque : 4 cm
- circonférence en dessous du tronc coeliaque : 3,5 cm
- paroi : souple
- intima : rougeâtre, quelques rares plaques d'artériosclérose

## 48. *Estomac*

*Etat actuel :*
- présent avec ouverture le long de la grande courbure

*Constatations :*
- paroi : sans particularité
- séreuse : sans particularité
- muqueuse : brun noirâtre, autolysée

## 49. *Intestins*

*Etat actuel :*
- extraits en bloc de la cavité abdominale

*Interventions complémentaires :*
- ouverture des intestins

*Constatations :*
- sans particularité
- appendice : pas identifiable
- signes d'autolyse

## 50. *Vessie*

*Etat actuel :*
- cavité ouverte à la face antérieure

*Interventions complémentaires :*
- évaluation de la perméabilité des méats à la sonde

*Constatations :*

- paroi : structure habituelle
- muqueuse : jaune grisâtre, légèrement autolysée
- trigone : d'aspect normal
- méats : perméables

## 51. Organes absents ou non identifiés

Les organes suivants n'ont pas pu être retrouvés ou identifiés:

- larynx et pharynx
- cartilage thyroïdien
- os hyoïde
- partie supérieure de la trachée
- partie de la musculature du cou
- ganglions cervicaux
- oesophage
- loges rénales
- mésentère
- surrénales
- pancréas
- vésicule biliaire
- prostate
- testicules
- appendice
- hypophyse

## E. Prélèvements

52. En vue d'analyses toxicologiques, nous avons prélevé du liquide rouge brunâtre (sang?) des cavités thoraco-abdominales, du muscle squelettique (muscle ilio-psoas des deux côtés), des fragments de foie, de reins, de cortex cérébral et une touffe de cheveux.

53. En vue d'examens histologiques, nous avons prélevé des fragments de tissus ou d'organes suivants :

- tissu fibro-adipeux sous l'angle mandibulaire gauche   (SM-G)
- muscle sterno-cléïdo-mastoïdien droit                  (SC-D)
- artère carotide droite                                 (C-D)
- artère carotide gauche                                 (C-G)
- poumon trilobé                                         (P-D)
- poumon bilobé                                          (P-G)
- ventricule gauche du coeur                             (VG)
- ventricule droit du coeur                              (VD)
- foie                                                   (F)
- rate                                                   (R)
- reins (gauche et droit)                                (RE)
- cervelet                                               (CV)
- cortex cérébral                                        (CO)
- peau du sillon au cou                                  (SI)
- trace d'injection/ponction au pli du coude droit       (IC)
- trace d'injection/ponction au dos de la main droite    (IM)

54. En vue d'analyses génétiques, nous avons prélevé du muscle squelettique (muscle ilio-psoas) et du liquide rouge brunâtre (sang?) de la cavité thoraco-abdominale.

Dr B. HORISBERGER
Médecin hospitalier

Professeur P. MANGIN

Dresse B. SCHRAG
Médecin assistant

# Examens histologiques

### Cervelet
*(coloration hématoxyline-éosine, van Gieson et bleu de Prusse)*

Le prélèvement correspond à une coupe d'un lobe cérébelleux. La structure générale est conservée. On note cependant la présence d'un très discret début d'altération à caractère postmortem. On ne constate pas de lésion notable. La réaction au bleu de Prusse est négative.

### Cortex cérébral
*(coloration hématoxyline-éosine, van Gieson et bleu de Prusse)*

Les prélèvements correspondent aux régions corticale et sous-corticale. La structure générale est conservée. Dans le tissu périvasculaire de plusieurs vaisseaux, on note la présence de dépôts de pigments brun jaunâtre, avec pour la plupart un discret infiltrat inflammatoire de cellules mononucléées. Le reste ne présente pas de lésion notable. La réaction au bleu de Prusse est négative.

### Ventricule gauche du cœur
*(coloration hématoxyline- éosine et van Gieson)*

Le prélèvement correspond à une section de la paroi du ventricule. La structure générale est conservée. On note cependant la présence de quelques discrets amas basophiles, de type bactérien postmortem. Les fibres musculaires sont régulièrement ordonnées, de taille moyenne. On note la présence de modifications à caractère postmortem (fragmentation) ainsi que par endroits de discrètes zones de bandes de contraction (de type I). Le tissu interstitiel est sans particularité L'épicarde et l'endocarde sont sans particularité

### Ventricule droit du cœur
*(coloration hématoxyline-éosine et van Gieson)*

Le prélèvement correspond à une coupe du ventricule. La structure générale est encore conservée, mais présente des débuts d'altération à caractère postmortem. On constate la présence de tissu adipeux sous-épicardique, plus abondant qu'au niveau du ventricule gauche et s'étendant également jusque dans la couche musculaire. Les fibres musculaires présentent par endroits une discrète ondulation.

### Reins
*(coloration hématoxyline-éosine et van Gieson)*

Les prélèvements ont été effectués au niveau des deux reins (un prélèvement par rein). La structure générale est l'objet d'un début d'altération à caractère postmortem, avec diminution, voire perte de la colorabilité des noyaux, en particulier l'épithélium des tubes urinifères et un début d'homogénéisation des structures, limitant l'interprétation. On ne constate cependant pas de lésion notable.

### Foie
*(coloration hématoxyline-éosine et van Gieson)*

Le prélèvement correspond au parenchyme hépatique. La structure générale est l'objet d'un début d'altération postmortem, avec diminution de la colorabilité des noyaux et modifications à caractère postmortem du parenchyme, limitant l'interprétation. On ne note cependant pas de fibrose, ni d'infiltrat inflammatoire. Les hépatocytes présentent une clarification hépatocytaire et, par endroits, une discrète vacuolisation (vacuoles optiquement vides, essentiellement microvésiculaires). Les espaces portes sont sans particularité

### Rate
*(coloration hématoxyline-éosine et van Gieson)*

Le prélèvement correspond au parenchyme splénique. La structure générale est l'objet d'un début d'altération à caractère postmortem. On ne constate cependant pas de lésion notable au niveau des pulpes blanche et rouge.

### Poumon trilobé
*(coloration hématoxyline-éosine, van Gieson)*

Le prélèvement correspond au parenchyme du poumon trilobé. La structure générale est conservée. On note cependant la présence de quelques amas basophiles de type bactérien postmortem. Les septa et les alvéoles sont d'aspect habituel. Dans la lumière des alvéoles, on note la présence de plusieurs pneumocytes desquamés, ainsi que par endroits du matériel éosinophile pâle (œdème). Les capillaires regorgent d'hématies.

### Poumon bilobé
*(coloration hématoxyline-éosine, van Gieson)*

Le prélèvement correspond au parenchyme du poumon bilobé. La structure générale est conservée. On note cependant la présence de quelques amas basophiles de type bactérien postmortem. Les septa et les alvéoles sont d'aspect habituel. Dans la lumière

des alvéoles, on note la présence de plusieurs pneumocytes desquamés, ainsi que, par endroits, du matériel homogène éosinophile pâle (œdème). Les capillaires regorgent d'hématies.

### Peau du sillon au cou
*(coloration hématoxyline-éosine, van Gieson et bleu de Prusse)*

Le prélèvement a été effectué à cheval sur le sillon et la peau saine avoisinante. Il comporte l'épiderme, le derme et l'hypoderme. La structure générale est conservée. A hauteur du sillon, l'épiderme est mince, avec des noyaux plus denses, plus rapprochés et de forme plus allongée qu'au niveau de la peau saine. On ne constate pas de signe de suffusion hémorragique ni dans le derme ni dans l'hypoderme. La réaction au bleu de Prusse est négative.

### Tissu fibro-adipeux sous l'angle mandibulaire gauche
*(coloration hématoxyline- éosine, van Gieson et bleu de Prusse)*

Le prélèvement comporte du tissu adipeux entrecoupé par des travées de tissu fibreux, du tissu fibreux en plages, de la musculature squelettique ainsi que du parenchyme glandulaire. La structure générale est conservée. On note la présence d'hématies extravasées (suffusions hémorragiques) au sein du tissu fibro-adipeux, sans réaction inflammatoire. Le parenchyme glandulaire est sans particularité Au niveau du muscle squelettique, on note la présence de quelques plages où les myocytes comportent des bandes de contraction (de type I). La réaction au bleu de Prusse est négative.

### Muscle sterno-cléido-mastoïdien droit
*(coloration hématoxyline- éosine, van Gieson et bleu de Prusse)*

Le prélèvement comporte des fibres musculaires, par endroits séparées par du tissu interstitiel fibreux. La structure générale est conservée. On constate la présence, par endroits d'hématies extravasées (suffusions hémorragiques), sans réaction inflammatoire. A certains endroits, les myocytes présentent des bandes de contraction de type I et II. La réaction au bleu de Prusse est négative.

### Artère carotide droite
*(coloration hématoxyline-éosine, van Gieson et bleu de Prusse)*

Trois prélèvements ont été effectués. La structure générale est conservée On constate la présence d'une paroi vasculaire de type artériel, ne présentant pas de lésion en dehors, par endroits, d'un très discret épaississement intimal (de type athéromateux). On ne constate en particulier pas de suffusion hémorragique. La réaction au bleu de Prusse est négative.

***Artère carotide gauche***
*(coloration hématoxyline-éosine, van Gieson et bleu de Prusse)*

Trois prélèvements ont été effectués. La structure générale est conservée On constate la présence d'une paroi vasculaire de type artériel, ne présentant pas de lésion en dehors, par endroits, d'un épaississement intimal (de type athéromateux), plus marqué qu'au prélèvement de l'artère carotide droite. On ne constate en particulier pas de suffusion hémorragique. La réaction au bleu de Prusse est négative.

***Trace d'injection/ponction au coude droit***
*(coloration hématoxyline-éosine, van Gieson et bleu de Prusse)*

Le prélèvement correspond à une section transversale intéressant l'épiderme, le derme et l'hypoderme. La structure générale est conservée. Comme seule lésion notable, on note la présence d'hématies extravasées au niveau de l'hypoderme, sans réaction inflammatoire. La réaction au bleu de Prusse est négative.

***Trace d'injection/ponction au dos de la main droite***
*(coloration hématoxyline éosine, van Gieson et bleu de Prusse)*

Le prélèvement correspond à une section transversale intéressant l'épiderme, le derme et l'hypoderme. La structure générale est conservée. Comme seule lésion notable, on note la présence d'hématies extravasées au niveau de l'hypoderme, sans réaction inflammatoire. La réaction au bleu de Prusse est négative.

# Diagnostic anatomo-pathologique

## 1) Signes de violence contre le cou

- Sillon aux deux tiers circulaire, avec une partie antérieure, située au tiers moyen du cou, large et mal délimitée, et des parties latérales plus étroites, parcheminées et mieux délimitées, ascendantes vers l'arrière, s'estompant en arrière avec le point de suspension virtuelle situé au niveau de la région occipitale

- Suffusion hémorragique de la partie supérieure du bord antérieur du muscle sterno-cléido-mastoïdien droit

- Suffusion hémorragique du tissu fibro-adipeux du cou, située juste en dessous de l'angle mandibulaire gauche

## 2) Autres lésions traumatiques vitales

- Traces d'injection/ponction entourées d'une ecchymose, l'une située au pli du coude droit, l'autre au dos de la main droite

- Exarticulation complète de la première incisive inférieure gauche (dent N° 31), avec déchirure de la gencive et suffusion hémorragique en regard

- Ebréchure récente du rebord incisif de la dent N° 22

- Erythèmes sulculaires localisés au niveau des dents N° 12, 11, 21, 22, susceptibles d'évoquer des signes de subluxation dentaire

- Fracture de l'angle mésial de la dent N° 41, susceptible d'être associée à l'exarticulation de la dent N° 31

## 3) Lésions préexistantes

- Très discrets signes d'artériosclérose (bifurcation des artères carotidiennes, aorte abdominale)

- Hémorragies périvasculaires anciennes et discrètes au niveau du cortex cérébral

## 4) Lésions consécutives à des interventions postmortem

- Cadavre ayant fait l'objet d'une autopsie intéressant les trois cavités, avec ouvertures de la face postérieure du tronc, des faces antérieures et postérieures des membres et plusieurs incisions postmortem au niveau des poignets et des chevilles

- Parties d'organes ou organes entiers manquants ou non identifiables: larynx, pharynx, cartilage thyroïdien, os hyoïde, partie supérieure de la trachée, partie de la musculature du cou, ganglions cervicaux, œsophage, loges rénales, mésentère, surrénales, pancréas, vésicule biliaire, prostate, testicules, appendice, hypophyse

## 5) **Autre constatation**

- Début d'altération cadavérique

**Institut universitaire de médecine légale**

Directeur: Professeur Patrice Mangin

Rue du Bugnon 21, CH-1005 Lausanne, Suisse
Tél : 41 21 / 314 70 70 – Fax : 41 21 / 314 70 90
E-mail : IUML.Central@inst.hospvd.ch

**Laboratoire de toxicologie et de chimie forensiques**

Lausanne, le 29-06-2006

**Concerne:**    **Dossier ALC 35502, Batch 764**
                 **Ahmed ALI ABDULLAH, 09.03.1969**

Nous avons effectué un dosage de l'alcool éthylique sur l'échantillon n° M0600113, au nom de Ahmed ALI ABDULLAH:

Type d'échantillon:  Sang            Date du prélèvement:   21-06-2006
Date de réception:   26-06-2006      Heure du prélèvement:

**Résultats:**

**Taux moyen d'alcool: 0.18 grammes pour mille.**
Intervalle de confiance: [0.13 ; 0.23] grammes pour mille.

**Remarque:**

Dr. Marc Augsburger
Biologiste, Toxicologue
Responsable du laboratoire

Copie:   Prof Patrice Mangin, IUML, Rue du Bugnon 21, 1005 Lausanne

*Le présent rapport ne concerne que les échantillons soumis à l'analyse. Des précisions sur les méthodes d'analyses utilisées peuvent être obtenues sur demande.*

*Les échantillons seront encore conservés pendant une année après la date de remise du présent rapport. Passé ce délai, et sauf avis contraire explicite de votre part, l'échantillon sera détruit.*

*Ce rapport ne peut pas être reproduit partiellement. L'utilisation de résultats individuels est autorisée si leur source est citée.*

Etat de Vaud – Hospices cantonaux
Département universitaire et de Santé communautaires
Université de Lausanne – Faculté de Médecine

Institut universitaire de médecine légale

Directeur: Professeur Patrice Mangin

Rue du Bugnon 21, CH-1005 Lausanne, Suisse
Tél : 41 21 / 314 70 70 – Fax : 41 21 / 314 70 90
E-mail : IUML.Central@inst.hospvd.ch

Laboratoire de toxicologie et de chimie forensiques

Lausanne, le 29-06-2006

**Concerne:**   **Dossier ALC 35503, Batch 764**
**Ahmed ALI ABDULLAH, 09.03.1969**

Nous avons effectué un dosage de l'alcool éthylique sur l'échantillon n° M0600113., au nom de Ahmed ALI ABDULLAH:

Type d'échantillon:  Muscle            Date du prélèvement:   21-06-2006
Date de réception:   26-06-2006        Heure du prélèvement:

Résultats:

**Taux moyen d'alcool: 0.13 grammes pour mille.**
Intervalle de confiance: [0.08 ; 0.18] grammes pour mille.

Remarque:

Dr. Marc Augsburger
Biologiste, Toxicologue
Responsable du laboratoire

Copie:  Prof Patrice Mangin, IUML, Rue du Bugnon 21, 1005 Lausanne

*Le présent rapport ne concerne que les échantillons soumis à l'analyse. Des précisions sur les méthodes d'analyses utilisées peuvent être obtenues sur demande.*

*Les échantillons seront encore conservés pendant une année après la date de remise du présent rapport. Passé ce délai, et sauf avis contraire explicite de votre part, l'échantillon sera détruit.*

*Ce rapport ne peut pas être reproduit partiellement. L'utilisation de résultats individuels est autorisée si leur source est citée.*

Etat de Vaud - Hospices cantonaux
Département Universitaire et de Santé communautaires
Unversité de Lausanne - Faculté de Médecine



Laboratoire de toxicologie et chimie forensiques
Responsable : Marc Augsburger, Dr ès Sc.

Directeur : Professeur Patrice Mangin
Rue du Bugnon 21, CH - 1005 Lausanne, Suisse
Tél : 41 21 / 314 70 70 - Fax : 41 21 / 314 70 90
E-mail : IUML.Central@hospvd.ch

Accréditation
STS448

Professeur
Patrice Mangin
Directeur de l'Institut Universitaire de
Médecine Légale
Rue du Bugnon 21
1005 Lausanne

Lausanne, le 29 juin 2006

**Concerne :**     **Rapport d'analyse TOX / 060626 – 35501**

**ALI ABDULLAH Ahmed, 1969**

**Recherche systématique de toxiques médicamenteux et de stupéfiants
dans les échantillons biologiques**

## I.     ECHANTILLONS

Le 26 juin 2006, nous avons reçu les échantillons suivants, prélevés au cours de l'autopsie
M0600113 :

- 3 fois env. 5 ml sang fluoré de la cavité thoraco-abdominale
- env. 5 ml de sang EDTA de la cavité thoraco-abdominale
- des échantillons de foie, de rein, de muscle squelettique, de cortex cérébral
- des cheveux







DUMSC
DÉPARTEMENT UNIVERSITAIRE DE MÉDECINE
ET SANTÉ COMMUNAUTAIRES



UNIVERSITÉ
DE
LAUSANNE

## II.     RESULTATS

### II.1.     Tests préliminaires

Résultats des tests préliminaires (tests immunologiques) effectués sur le sang :

| Substance | Résultat | Cut-Off |
|---|---|---|
| Amphétamines | non détecté | 25 ng équivalents d-amphétamine/ml |
| Barbituriques | non détecté | 20 ng équivalents sécobarbital/ml |
| Benzodiazépines | non détecté | 10 ng équivalents oxazépam/ml |
| Buprénorphine | non détecté | 0.5 ng équivalents buprénorphine/ml |
| Cannabis | non détecté | 5.0 ng équivalents acide $\Delta^9$-THC-9-carboxylique/ml |
| Cocaïne | non détecté | 20 ng équivalents benzoylecgonine/ml |
| LSD | non détecté | 1.0 ng équivalents LSD/ml |
| Méthadone | non détecté | 10 ng équivalents méthadone/ml |
| Opiacés | non détecté | 10 ng équivalents morphine/ml |

❑     Autre test préliminaire effectué sur le sang :

Cyanure          non détecté

### II.2.     Screenings, confirmations et dosages

Lors des analyses qualitatives effectuées par CPG-SM, les toxiques volatils et non-volatils basiques, acides et neutres sont recherchés (en principe, les drogues, "designer drugs", poisons, pesticides, agents dopants, solvants et autres polluants ainsi que leurs métabolites mentionnés dans les bibliothèques Pfleger, Maurer et Weber (éd. 2000), Wiley7N, AAFS2000, NIST98 et IUML_Tox).

### II.2.1.  Foie

❑     Les analyses qualitatives effectuées par CPG-SM ont démontré la présence des substances suivantes :
-     **Caféine et théobromine**

### II.2.2.  Sang

❑     Les analyses qualitatives effectuées par CPG-SM n'ont pas mis en évidence la présence des substances recherchées.

❑  Les analyses qualitatives effectuées par HS-CPG-DIF ont démontré la présence des substances suivantes (N°ALC-35502) :

- **Ethanol**
- **Acétone**
- **1-Propanol**
- **2-Butanol**

❑  Les analyses quantitatives effectuées par HS-CPG-DIF ont donné les résultats suivants (N°ALC-35502) :

Ethanol :                0.18  g/kg (intervalle de confiance : 0.13 – 0.23 g/kg)

## II.2.3. Muscle

❑  Les analyses qualitatives effectuées par HS-CPG-DIF ont démontré la présence des substances suivantes (N°ALC-35503) :

- **Ethanol**
- **Acétone**
- **1-Propanol**
- **2-Butanol**

❑  Les analyses quantitatives effectuées par HS-CPG-DIF ont donné les résultats suivants (N°ALC-35503) :

Ethanol :                0.13  g/kg (intervalle de confiance : 0.08 – 0.18 g/kg)

## III.    DISCUSSION

## III.1.  Remarque

Certaines substances mises en évidence lors des analyses, à savoir l'éthanol, l'acétone, le 1-propanol, ainsi que le 2-butanol, peuvent apparaître lors de l'altération cadavérique.

## IV.    CONCLUSION

Les analyses des échantillons biologiques prélevés lors de l'autopsie M0600113 pratiquée sur **Ahmed ALI ABDULLAH (TOX-35501, ALC-35502 et ALC-35503)** indiquent la présence dans le sang d'alcool éthylique (éthanol), d'acétone, de 1-propanol et de 2-butanol. Dans le foie, de la caféine et de la théobromine ont été mises en évidence. En outre, dans le muscle squelettique, de l'alcool éthylique (éthanol) a été mis en évidence.

Certaines substances mises en évidence lors des analyses, à savoir l'éthanol, l'acétone, le 1-propanol, ainsi que le 2-butanol, peuvent apparaître lors de l'altération cadavérique.

*En tenant compte des limites de sensibilité des techniques analytiques mises en oeuvre, les analyses des principaux échantillons biologiques à disposition n'ont pas révélé la présence d'autres toxiques, stupéfiants ou médicaments courants en quantités qui peuvent être considérées comme significatives sur le plan toxicologique. Le présent rapport ne concerne que les échantillons soumis à l'analyse. Des précisions sur les méthodes d'analyses utilisées, en particulier concernant leur incertitude de mesure, peuvent être obtenues sur demande. Les échantillons seront encore conservés pendant 12 mois après la date de remise du présent rapport. Passé ce délai, et sauf avis contraire explicite de votre part, l'échantillon sera détruit. Ce rapport ne peut pas être reproduit partiellement. L'utilisation de résultats individuels est autorisée si leur source est citée.*

**Frank Sporkert**, Dr. rer nat.
*Chimiste analyste*
*Adjoint du responsable du laboratoire*

**Marc Augsburger**, Dr ès Sc.
*Biologiste, Toxicologue*
*Responsable du laboratoire*

Institut universitaire de médecine légale

Laboratoire de génétique forensique
Rue du Bugnon 21, CH-1005 Lausanne, Suisse
Tél : +41 21 / 314 70 70 ; Fax : +41 21 / 314 70 90
E-mail : IUML.Central@hospvd.ch

STS 420

Monsieur le Professeur
Patrice Mangin
IUML

*N/Réf. : P06-00068 – cas*

Lausanne, le 28 juin 2006

**Concerne : Détermination de l'origine d'un échantillon de sang par des analyses
de génétique forensique**

Monsieur le Professeur,

Le 26 juin 2006, nous avons reçu de l'unité de médecine forensique du sang sur papier
FTA et un morceau de muscle prélevés sur un corps de sexe masculin ayant fait l'objet
de l'autopsie M0600113.

Notre mission était d'établir et de confronter les profils ADN établis à partir de ce
matériel ainsi que de confirmer la nature du matériel analysé.

Nous avons répondu à votre demande. Vous trouverez ci-après notre rapport.

### Matériel à analyser

Le 23 juin 2006, nous avons reçu du sang sur papier FTA et un morceau de muscle
prélevés sur le corps de ALI ABDULLAH Ahmed, né le 09.03.1969 (autopsie
M0600113).

### Méthodes

L'ADN des échantillons a été extrait, puis amplifié par PCR (Polymerase Chain
Reaction) au moyen du kit PowerPlex16 (Promega) en suivant les instructions du
fabricant. Ce dernier permet l'analyse simultanée de 15 locus génétiques indépendants
les uns des autres ainsi que la détermination du sexe de la personne source de
l'échantillon (amélogénine). Finalement, le profil génétique est obtenu en analysant
l'ADN précédemment amplifié au moyen d'un appareil d'électrophorèse capillaire. Les
analyses ont été effectuées à double selon les directives de la Société suisse de

Institut universitaire de médecine légale
Laboratoire de génétique forensique
Rue du Bugnon 21, CH-1005 Lausanne, Suisse
Tél : +41 21 / 314 70 70 ; Fax : +41 21 / 314 70 90
E-mail : IUML.Central@hospvd.ch

Médecine légale. Nous avons également analysé le sang reçu au moyen du test Seratec HemDirect qui est un test immunochromatographique permettant de détecter la présence d'hémoglobine humaine ou de primate.

## *Résultats*

Les analyses effectuées à double à l'Institut universitaire de médecine légale de Lausanne ont donné des profils identiques pour les marqueurs génétiques examinés. En particulier, un même profil masculin de 15 locus a été obtenu pour le sang et pour le muscle prélevés sur le corps ayant fait l'objet de l'autopsie M0600113. Le test Seratec HemDirect a donné un résultat positif, ce qui signifie que de l'hémoglobine a été détectée.

## *Conclusions*

Les profils ADN obtenus pour le sang et le muscle prélevés sur le corps ayant fait l'objet de l'autopsie M0600113 présentent les mêmes caractéristiques génétiques. La valeur probante de ce résultat analytique a été évaluée en fonction des deux hypothèses suivantes :

- H1 : le sang et le muscle proviennent tous deux du corps autopsié
- H2 : le sang et le muscle proviennent de deux personnes non apparentées

Le rapport de vraisemblance calculé selon les fréquences des allèles dans la population suisse est supérieur à 10'000'000, ce qui signifie qu'il est environ 10'000'000 de fois plus probable d'observer ces profils si le sang et le muscle proviennent tous deux du corps autopsié plutôt que de deux personnes différentes.

**Nos résultats d'analyses soutiennent donc très fortement l'hypothèse selon laquelle le sang et le muscle proviennent tous deux du corps ayant fait l'objet de l'autopsie M0600113.**

Restant à votre disposition pour tout renseignement complémentaire, nous vous prions de croire, Monsieur le Professeur, à l'expression de notre parfaite considération.

C. SIMILI
Biologiste

V. CASTELLA
Biologiste, Dr ès Sc.

**Important** : le présent rapport n'est valide que pour les échantillons analysés et dans les limites de sensibilité des méthodes d'analyse utilisées. Des précisions sur ces dernières peuvent être obtenues sur demande. Tout ou partie de ce rapport ne peut être reproduit sans autorisation écrite du laboratoire. Une copie du présent rapport sera conservée pendant au moins cinq ans à notre institut. Le solde du matériel sera conservé pendant 1 année à compter de la date d'envoi du présent rapport. Passé ce délai, et sauf avis contraire de votre part, ce matériel sera détruit.

**INSTITUT UNIVERSITAIRE DE MEDECINE LEGALE**
**Unité d'odontostomatologie médico-légale**
**rue du Bugnon 21**
**1005 LAUSANNE**

Lausanne, le 27 juin 2006

## RAPPORT D'EXAMEN ODONTOSTOMATOLOGIQUE POSTMORTEM SUR LA BASE DE DOCUMENTS PHOTOGRAPHIQUES

Cadavre **M0600113**

Identité transmise : **Ahmed Ali Abdullah, 03.09.69**

**Examen demandé par :** Prof. Patrice Mangin, Dr Beat Horisberger, Dresse Bettina Schrag, médecins légistes

**Examen effectué par :** Dr Michel Perrier MER, odontologiste consultant

**Date de l'examen:** 27.06.06

**Documents photographiques fournis par :**

- Drs Beat Horisberger et Bettina Schrag, médecins légistes

**Renseignements AM :**

- aucun

**Relevé PM**

- 11 photographies postmortem

## A. Constatations

**1. Maxillaire :**

- lésion horizontale du bord vermillon (env. 1.5 cm) située sur la partie droite de la lèvre supérieure
- faces vestibulaires dentaires visibles: 13, 12, 11, 21, 22, 23
- signes discrets de gingivite et de colorations

- sulcus gingival régulier présentant par endroits (12, 11, 21, 22) un érythème pouvant évoquer une subluxation dentaire d'origine traumatique
- muqueuse alvéolaire légèrement hypertrophique
- aucun signe apparent de parodontite
- 22 : bord incisif ébréché (lésion de caractère récent au vu de la netteté du trait de fracture)
- 23 : attrition manifeste du bord incisif

## 2. Mandibule :

- faces vestibulaires dentaires visibles : 33, 32, 41, 42, 43
- signes de gingivite avec colorations et discrets dépôts de tartre
- pas de signe apparent de parodontite
- 41 : fracture de l'angle mésial; caractère récent de l'événement difficile à évaluer
- 31 : dent manifestement désarticulée (éventuel vestige radiculaire non visible), associée à une déchirure localisée de la muqueuse qui s'étend en direction vestibulaire et au-delà de la ligne muco-gingivale avec béance de l'alvéole dentaire ne présentant aucun signe de cicatrisation ou de granulation. La lésion évoque un traumatisme dentaire récent et violent, probablement en direction vestibulaire (vers l'extérieur) avec destruction apparente de la paroi osseuse alvéolaire externe. Il n'est pas exclu que la fracture de l'angle mésial de la dent 41 soit associée à ce traumatisme. Les documents photographiques disponibles ne permettent cependant pas d'étayer cette dernière hypothèse.

## B. Conclusions

Sur la seule base de documents photographiques, le soussigné constate la présence de traumatismes récents sur les dents suivantes :

1. dent 22 : ébréchure récente du rebord incisif ;
2. dents 12, 11, 21, 22 : érythèmes sulculaires localisés susceptibles d'évoquer des signes de subluxation dentaire ;
3. dent 31 : exarticulation traumatique dont l'examen indique que l'événement est intervenu juste avant la mort ou dans un intervalle périmortem ;
4. dent 41 : fracture de l'angle mésial difficile à évaluer dans le temps mais susceptible d'être associée à l'exarticulation de la dent 31.

L'ensemble de ces constatations a été effectué sur la base de documents photographiques uniquement. Les lésions constatées semblent compatibles avec un événement traumatique intervenu juste avant la mort ou dans un intervalle périmortem.

Dr Michel Perrier
médecin-dentiste consultant

# Renseignements communiqués par l'Organisation « Alkarama for Human Rights »

Selon les renseignements obtenus de l'Organisation « Alkarama for Human Rights », le 10 juin 2006, trois personnes sont décédées dans le camp de détention de Guantanamo, à savoir Ahmed ALI ABDULLAH, de nationalité yéménite et deux ressortissants souadiens.

L'Organisation « Alkarama for Human Rights » a été sollicitée par la famille de la victime pour l'assister dans l'organisation d'une deuxième autopsie du corps, en particulier pour savoir si l'hypothèse du suicide pourrait être confirmée ou infirmée.

Concernant Ahmed ALI ABDULLAH , l'organisation nous donne les renseignements suivants : il était détenu depuis 4 ans à Guantanamo. La famille n'avait pas eu de contact avec lui. Les parents avaient envoyé deux lettres, sans réponse. Le père récuse le diagnostic de suicide avancé par les autorités américaines. En effet, le suicide est prohibé par la religion islamique et donc contraire aux convictions religieuses de son fils. De plus, un autre de ses fils est toujours détenu à Guantanamo.

Concernant les deux ressortissants saoudiens, il nous a été communiqué que leurs corps avaient fait l'objet également d'une autopsie à la demande des autorités saoudiennes.

Le Dr Saeed G. Al-Ghamdy, directeur de l'institut de médecine légale de Riyadh, nous a communiqué qu'il avait effectivement procédé aux autopsies et qu'il s'était adressé aux autorités américaines pour compléter ses informations notamment quant aux circonstances de découverte des corps et aux investigations médicales et médico-légales pratiquées sur place et avant la remise des corps aux familles.

M06001113 / 27

# Discussion

La discussion se base sur les renseignements reçus de l'Organisation « Alkarama for Human Rights », ainsi que sur les résultats des investigations médico-légales, en particulier la deuxième autopsie médico-légale effectuée par l'équipe de l'Institut universitaire de médecine légale de Lausanne  11 jours après le décès.

Lors de la deuxième autopsie nous avons principalement mis en évidence des signes de violence contre le cou, sous la forme :

- d'un sillon aux deux tiers circulaire, ascendant vers l'arrière
- d'une suffusion hémorragique du muscle sterno-cléïdo-mastoïdien droit
- d'une suffusion hémorragique du tissu fibro-adipeux située juste sous l'angle mandibulaire gauche.

D'autre part, nous avons constaté deux traces d'injection/ponction avec ecchymose au niveau du membre supérieur droit (pli du coude et dos de la main), ainsi qu'une exarticulation fraîche de la première incisive inférieure gauche avec suffusion hémorragique en regard. Ces lésions sont toutes vitales, ce qui signifie que l'intéressé les a subies de son vivant.

Lors de l'autopsie, nous avons constaté que le corps de l'intéressé avait déjà fait l'objet d'une première autopsie, comportant les ouvertures des trois cavités, de la face dorsale du tronc et des faces antérieures et postérieures des membres, éviscération complète et restitution des viscères dans un sac en plastic, à l'exception de certains organes ou parties d'organes (voir ci-dessus), section des organes  et parties d'organes.

Il est par ailleurs nécessaire de souligner les limites de l'interprétation médico-légale, résultant d'une part d'un début d'altération postmortem, et d'autre part des remaniements induits par la première autopsie, entraînant l'impossibilité de prélever certains échantillons biologiques en vue d'analyses toxicologiques (notamment sang périphérique et urine), et l'impossibilité d'examiner certains d'organes ou de parties d'organes, tel que le larynx avec son squelette.

Sur la base des éléments actuellement à notre disposition, la cause du décès la plus vraisemblable est une asphyxie mécanique consécutive à une violence exercée contre le cou. Cette asphyxie est compatible avec une pendaison, sans cependant pouvoir exclure formellement un autre mécanisme de violence (par exemple strangulation), seul ou combiné avec la pendaison.

Les lésions odontostomatologiques constatées, en particulier l'exarticulation fraîche de l'incisive inférieure à gauche, en l'absence de contusion des lèvres, nécessite impérativement de pouvoir accéder aux rapports établis par les autorités  américaines. Les signes constatés in situ évoquent une origine traumatique et pourraient être, le cas échéant, consécutifs aux manœuvres de réanimation. Ils n'évoquent pas en revanche

un traumatisme contondant exercé contre la région buccale, faute d'autres lésions de violence associées (plaie contuse, ecchymose).

Concernant les traces d'injection/ponction avec ecchymose constatées au membre supérieur droit (pli du coude et dos de la main), les trois hypothèses peuvent être envisagées :

1) lésions survenues dans le cadre d'une tentative de réanimation

2) injection/ponction par un tiers avant le décès

3) injection/ponction par l'intéressé lui-même (hypothèse paraissant peu vraisemblable)

A noter que le corps présentait un état de nutrition et d'hygiène satisfaisant.

Les analyses de génétique forensique ont permis d'établir que le liquide rouge brunâtre recueilli dans la cavité thoraco-abdominale est du sang humain et qu'il provient bien du corps dont l'identité nous avait été communiquée comme étant celle de ALI ABDULLAH Ahmed.

En l'absence de sang périphérique, les analyses toxicologiques ont été effectuées sur l'échantillon de sang recueilli dans les cavités thoraco-abdominales. Les résultats de ces analyses indiquent la présence dans le sang d'alcool éthylique à un taux moyen de 0.18 g/kg, d'acétone, de 1-propanol et de 2-butanol, ceci en l'absence de toute autre substance d'intérêt médico-légal. Selon toute vraisemblance, ces substances ont été produites dans le cadre du processus d'altération cadavérique constaté lors de la deuxième autopsie. Par conséquent, au moment du décès, l'intéressé n'était vraisemblablement pas sous l'influence de substances médicamenteuses ou de stupéfiants.

Concernant les circonstances du décès, il y a lieu de relever un certain nombre de points nécessitant un complément d'informations en effet :

- les parties du sillon cervical qui sont bien délimitées et étroites (parties latérales) ne sont pas habituellement observées avec le mode opératoire indiqué (utilisation de drap et d'habits comme moyen de pendaison),

- les hémorragies des plans sous-jacents du cou ne coïncident pas formellement avec le sillon constaté en regard au niveau de la peau,

- Il existe d'autres lésions traumatiques ailleurs qu'au niveau du cou, en particulier une exarticulation fraîche de la première incisive inférieure gauche et la présence de traces d'injection/ponction au niveau du membre supérieur droit pour autant qu'elles n'entrent pas dans le cadre d'une tentative de réanimation ou d'une autoagression.

A la date actuelle et sous réserve des éléments précédemment cités, l'ensemble de nos investigations ne paraît néanmoins pas incompatible avec l'hypothèse d'un suicide par pendaison, sans pouvoir exclure de façon absolue, une autre éventualité. A cet effet,

nous avons adressé une demande d'informations complémentaires auprès des autorités américaines (cf lettre en annexe). A ce jour, nous ne disposons pas des informations demandées. Nous nous réservons ainsi le droit de reconsidérer nos conclusions en fonction des informations qui nous seraient communiquées.

Il convient d'observer que nos collègues saoudiens en charge de la seconde autopsie des deux autres détenus ont également manifesté le besoin d'obtenir un complément d'information allant dans le même sens que nous.

En tout état de cause, une évaluation des conditions de détention nous paraît indispensable. Celle-ci n'est toutefois pas du ressort des experts médico-légaux.

## **Conclusions**

1) **Lors de nos investigations, nous avons mis en évidence essentiellement des signes de violence au niveau du cou (sillon, hémorragie des plans musculaires et fibro-adipeux), deux traces d'injection/ponction avec ecchymoses au membre supérieur droit et une exarticulation fraîche de la première incisive inférieure gauche.**

2) **La cause du décès est selon toute vraisemblance la conséquence d'une asphyxie mécanique par une violence exercée contre le cou dans le cadre d'une pendaison, sans pouvoir exclure formellement un autre mécanisme.**

3) **Les traces d'injection/ponction avec ecchymoses au membre supérieur droit ainsi le traumatisme dentaire devraient pouvoir s'expliquer par des manœuvres de réanimation. Dans le cas contraire, elles constitueraient un élément de suspicion quant aux circonstances du décès.**

4) **Les analyses toxicologiques n'ont pas mis en évidence de médicaments ou de stupéfiants susceptibles d'interférer avec le décès ou les circonstances de survenue de celui-ci.**

5)    En l'état actuel de nos investigations, des informations à notre disposition et
sous réserve du point 3, nos constatations ne sont pas incompatibles avec
l'hypothèse d'un suicide par pendaison.

6)    Dans cette hypothèse, et pour tenir compte des objections avancées par la
famille, il y aurait lieu de s'interroger sur le rôle des conditions de détention
dans la survenue de cet acte d'autoagression.

7)    A la date de la présente expertise, les informations demandées aux autorités
américaines ne nous ont pas été communiquées.

Restant à votre disposition pour tout renseignement complémentaire, nous vous prions
de croire, Maître, à l'assurance de notre parfaite considération.

Dr B. HORISBERGER                                          Professeur P. MANGIN
Médecin hospitalier

Dresse B. SCHRAG
Médecin assistant

Annexe : lettre du 29 juin 2006, adressée  au Dr Craig T.Mallak par Maître Rachid
Mesli, à la demande du Prof. Patrice Mangin